NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0203n.06

Nos. 11-5592, 11-5888, 11-5893

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Feb 25, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| JOHNNIE MARTIN, LASHONDA HALL, and | ) | |
| AARON BROOKS, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE: McKEAGUE and GRIFFIN, Circuit Judges; and DLOTT, District Judge.[*]

GRIFFIN, Circuit Judge.

The three cases consolidated in this appeal involve a large-scale drug operation in which drugs were obtained from suppliers in Atlanta, Georgia, and redistributed for profit in Knoxville, Tennessee. Defendants Johnnie Martin, Lashonda Hall, Aaron Brooks, and several other co-defendants were charged with conspiracy to violate the federal drug laws, among other crimes. Martin was tried separately, and Hall and Brooks were tried jointly. This appeal followed their convictions and sentences. We affirm.

---

[*]The Honorable Susan Dlott, United States District Judge for the Southern District of Ohio, sitting by designation.

I.

In February of 2007, the government began investigating James Cofer's involvement in narcotic sales in Knoxville, Tennessee. After a series of controlled buys of crack cocaine by a confidential informant, the government obtained court authorization to wiretap Cofer's phone. Additional wiretapping led to Travares Smith, an individual dealing cocaine on the streets of Knoxville at the direction of a man later identified as defendant Martin.

Through additional wiretapping, the government learned that Martin, the organization's leader, had stash houses throughout Knoxville, each set up to sell a certain type of drug. Vernon Jackson and Vincent Stanley lived in a house at 1919 Dodson, called the "wood house," which was set up to sell marijuana and Ecstasy. Matthew Orr lived in a house at 2750 Sunset, called the "crack house," which was set up to sell crack cocaine. Smith and defendant Brooks lived in a house at 1701 Rugby Avenue, called the "weight house," which was set up to sell cocaine. Martin and his girlfriend, defendant Hall, lived in a house at 3916 Deerfield, which the organization referred to as "justice hall." Martin supplied guns to members of the organization to protect the money and drugs at each location.

At Martin's direction, members of the organization obtained drugs from suppliers in Atlanta and brought them back to Knoxville for resale. Smith would travel to Atlanta to purchase cocaine from a man named Michael Briddy. Because Smith did not have a driver's license, Hall or a woman named Cassie McKenzie would drive him. Smith would travel to Atlanta at least twice a week, picking up at least two kilograms of cocaine per trip.

Jackson and Stanley would drive to Atlanta to purchase marijuana from a man named Mashato Lamar. On April 24, 2007, a patrol officer stopped Jackson on the interstate for following too closely. When the officer smelled raw marijuana, he had Jackson step out of the vehicle. In the back seat, the officer found a backpack with a large, vacuum-sealed bag that had been cut open and, although empty, smelled of raw marijuana. The backpack also contained roughly $14,000, which the government seized.

Shortly thereafter, the government decided that it was time to intervene. The original plan was to follow members of the organization on the next scheduled trip to Atlanta and arrest individuals in the process of a drug transaction. It was soon learned, however, that Martin was sending two cars to Atlanta, instead of one, with $85,000 split between the two cars. Having recently lost $14,000 because of a traffic stop, the decision to send two cars was strategic; if the police stopped one car, not all of the money would be taken. In light of the new travel arrangement, the government decided to intervene in Knoxville, before the scheduled trip.

On May 3, 2007, the government executed a search warrant at each stash house. Smith, Brooks, Hall, and Martin were arrested at 1701 Rugby Avenue. In the kitchen, officers arrested Smith and found a firearm and two bags of cocaine. Ecstasy was found in the floor of the bedroom and inside a pack of cigarettes in a vehicle parked outside. In a bedroom closet, agents found a set of scales and a plastic bag containing cocaine. Hall was arrested in the living room, where a firearm was found under a couch cushion. Martin fled out the back door, but he was eventually apprehended. Approximately $6,000 was found on Martin's person.

Jackson and Stanley were arrested at 1919 Dodson, where agents seized currency, marijuana, Ecstasy, scales, packaging equipment, firearms, receipts, and a drug ledger. Orr was arrested at 2750 Sunset, where crack cocaine, currency, and firearms were seized. A firearm was found in the bedroom on top of the television. A second firearm was found on the pillow. A third gun was found in the closet, along with several individually wrapped plastic bags of crack cocaine. In the kitchen area, agents found a set of scales and a couple bags of crack cocaine. From inside a dresser in one of the bedrooms, agents recovered a couple bags of marijuana and a set of scales.

No one was present at 3916 Deerfield, where agents seized marijuana, currency, and a firearm. Agents observed that the closets in the master bedroom were full of male and female clothing, and the toiletries in the bathroom suggested that both a man and a woman lived in the house. Agents seized an amount of currency from a dresser drawer and a loaded firearm standing between the night stand and the bed. They also found currency in the cold air return of the house and marijuana in the closet of the room adjacent to the garage. The currency found in the house totaled over $66,000.

Smith immediately agreed to cooperate, admitting his guilt and disclosing other participants. Acting at the direction of government agents, Smith called Briddy and explained that several members of the organization had been arrested but that he had not been caught. He told Briddy that he was coming to Atlanta with money that Martin owed him. Having convinced Briddy of the story, Smith accompanied agents to Atlanta the next day and set up a meeting with Briddy and Lamar. At the meeting, agents apprehended Briddy and Lamar and seized marijuana and a firearm.

Meanwhile, McKenzie, one of the individuals thought to be involved in the conspiracy, had not been arrested, but had apparently been in contact with Martin. Allegedly, Martin told McKenzie that he wanted Smith killed because "he snitched on him and got everybody locked up." As it turns out, before his arrest, Martin had recruited a man named Jason Nelson to help him address any "problems" that arose in connection with the drug operation. Martin had given Nelson a gun with instructions to ensure that no one interfered with drug sales or disrespected him. When Nelson learned that Martin had been arrested, he contacted McKenzie, who told him that Martin wanted Smith killed. Nelson purchased black clothing and gun wipes in preparation for the kill.

Having learned of the threat against Smith, agents set out to locate McKenzie and Nelson. When an officer attempted to make a traffic stop of a vehicle being driven by Nelson in which McKenzie was a passenger, the police were led on a high-speed car chase. Eventually, McKenzie and Nelson were apprehended. From inside the vehicle, the police seized a firearm, cocaine, Ecstasy, and currency.

On May 8, 2007, the government charged Martin, Brooks, Hall, and three other individuals in an indictment, which was superseded on July 10, 2007, and further superseded on December 11, 2007. Martin was charged with conspiring to distribute and possess with intent to distribute at least five kilograms of cocaine hydrochloride, at least fifty grams of crack cocaine, and quantities of marijuana and Ecstasy (Count One); possessing with intent to distribute marijuana (Count Three); possessing a firearm in furtherance of a drug trafficking crime (Counts Two and Four); possessing a firearm as a convicted felon (Count Five); using a minor to commit a drug trafficking crime (Count

Six); conspiring to commit money laundering and committing money laundering (Counts Fifteen and Sixteen); and conspiring to kill a federal witness (Count Seventeen). Hall was charged with conspiring to distribute and possess with intent to distribute at least five kilograms of cocaine hydrochloride, at least fifty grams of crack cocaine, and quantities of marijuana and Ecstasy (Count One); possessing with intent to distribute marijuana (Count Three); possessing a firearm in furtherance of a drug trafficking crime (Counts Two and Four); and conspiring to commit money laundering (Count Fifteen). Brooks was charged with conspiring to distribute and possess with intent to distribute at least five kilograms of cocaine hydrochloride, at least fifty grams of crack cocaine, and quantities of marijuana and Ecstasy (Count One); possessing with intent to distribute 500 grams or more of cocaine hydrochloride (Count Eight); possessing a firearm in furtherance of a drug trafficking crime (Counts Seven and Nine); possessing a firearm as a convicted felon (Count Ten); and conspiring to commit money laundering (Count Fifteen).

Martin's first trial commenced on February 27, 2008. On March 10, 2008, a jury convicted him of possessing a firearm as a convicted felon (Count Five), but could not reach a unanimous decision regarding the remaining charges. Consequently, the district court declared a mistrial. Martin's second trial commenced on March 30, 2009. On April 7, 2009, a jury convicted Martin of all charges except conspiring to kill a federal witness (Count Seventeen), for which he was acquitted. On April 19, 2011, the district court sentenced Martin to 720 months' imprisonment. Martin timely appealed.

A joint trial for Hall and Brooks commenced on June 8, 2009. The court dismissed the charge of conspiring to commit money laundering (Count Fifteen) as to Brooks. A jury convicted Hall and Brooks of all remaining charges. On July 8, 2011, the district court sentenced Hall and Brooks to 548 months' imprisonment. Both timely appealed. In the interest of judicial efficiency, the three appeals have been consolidated for this court's review.

II.

Martin and Hall argue that prosecutorial misconduct denied them a fair trial. We review claims of prosecutorial misconduct de novo. *United States v. Stover*, 474 F.3d 904, 914 (6th Cir. 2007). Applying a two-step inquiry, if the court first determines that the prosecution's conduct was improper, it next determines whether the impropriety was flagrant. *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). To determine whether an impropriety was flagrant, and therefore requires reversal, the court considers and weighs four factors: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Id*. If the impropriety was not flagrant, reversal is warranted only if "(1) the proof against the defendant was not overwhelming, (2) opposing counsel objected to the conduct, and (3) the district court failed to give a curative instruction." *United States v. Abboud*, 438 F.3d 554, 584 (6th Cir. 2006) (internal quotations marks omitted). When approaching these questions, we consider the context of the trial as a whole. *United States*

*v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008). Improper comments, standing alone, do not warrant reversal if the proceedings were otherwise fair. *Id.*

Where the defendant fails to object to the alleged misconduct, our review is for plain error. *United States v. Collins*, 78 F.3d 1021, 1039 (6th Cir. 1996). Under plain-error review, a defendant is required to show that: (1) an error occurred in the district court; (2) the error was plain; (3) the error affected his substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Kingsley*, 241 F.3d 828, 835 (6th Cir. 2001). We will reverse "only in exceptional circumstances and only where the error is so plain that the trial judge and prosecutor were derelict in countenancing it." *Collins*, 78 F.3d at 1039 (internal quotation marks omitted).

Martin alleges five instances of prosecutorial misconduct. He first complains that the prosecutor improperly vouched for the credibility of a witness. "Improper vouching occurs when a prosecutor . . . bluntly states a personal belief in a witness's credibility . . . ." *Henry*, 545 F.3d at 378–79. During rebuttal argument, the prosecutor told the jury, without objection, that Smith "was untouched" during cross examination "because he was telling you the truth." What Martin fails to mention, however, is the credibility attack launched by defense counsel that preceded the prosecutor's allegedly improper remark. Just earlier, defense counsel had stated: "I promised you that I would show you that every [convicted felon who testified on behalf of the government], without exception, was lying in this case. I think you see that I also kept my word." A prosecutor "may attempt to explain why, based on the facts, that witness's testimony is honest after the same

has been attacked by the defense." *Id*. at 379. Viewed in context, the prosecutor's remark regarding Smith's credibility was a fair response to defense counsel's earlier accusations that the government's witnesses were testifying falsely.

Second, Martin complains that the prosecutor asked if the jury had heard certain evidence suggested by defense counsel and then stated, "Of course not, because it's not true." Defense counsel objected, at which point the court clarified that it was "up to the jury to recall what the evidence is and this is the opportunity for counsel for the parties during closing argument to discuss with you what they believe the evidence in this case has shown." In its final charge to the jury, the court repeated the instruction that statements and arguments by attorneys are not evidence. Therefore, even assuming that the prosecutor's remark was improper, it is unlikely that the remark misled the jury or resulted in prejudice, making reversal unwarranted. *See Washington v. Hofbauer*, 228 F.3d 698, 706 (6th Cir. 2000) ("[W]e must presume that juries follow their instructions.").

Third, Martin complains that the prosecutor improperly characterized parts of defense counsel's closing argument as "ridiculous" and "border[ing] on the incredible." The prosecutor also commented on "the audacity" of defense counsel to say that it was not Martin talking in the wiretapped conversation. Previously, however, defense counsel had characterized part of the prosecutor's argument as "[r]idiculous" and "totally unbelievable," and accused the government of "knowingly present[ing] false evidence." Defense counsel further stated, referring to the government, "They lied. They lied. They lied. (Banging the podium)." Under the "invited response" rule, where the prosecutor's remarks were "invited" and do no more than respond

substantially in order to "right the scale," the impropriety does not warrant reversal. *Henry*, 545 F.3d at 381 (internal quotation marks omitted). Thus, although we do not condone the actions of either counsel, where defense counsel has opened the door for the prosecutor to respond in opposition, reversal is not an available remedy. *See id.*

Martin next complains that the prosecutor engaged in misconduct when he told the jury that "[i]f you believe a word of what counsel for the defendant just said, you believe I am going to risk my career and my credentials as a Department of Justice employee for the United States government to put an innocent man in jail?" The prosecutor stated that defense counsel would have the jury believe that they were all "corrupt unethical criminal[s]." We are troubled by the prosecutor's reference to the Department of Justice and the United States government. A prosecutor may not place the prestige of the government behind a witness or imply that he has special knowledge of facts not before the jury by virtue of his office. *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). Thus, the instant remarks arguably smack of improper vouching. Nonetheless, even if the prosecutor may have overstepped his bounds, it does not necessitate reversal. Because Martin did not object and has not argued that the error affected his substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings, reversal is unwarranted. *United States v. Jones*, 108 F.3d 668, 672–73 (6th Cir. 1997) (en banc).

In his last claim of prosecutorial misconduct, Martin argues that the prosecutor improperly inflamed the jury's emotions. In support of this position, he points to the prosecutor's statements

that "[Martin] gets a child . . . to peddle his poison on the streets" and "[i]f you are part of his organization, don't cross him, ladies and gentlemen, because then he dispatches somebody to kill you." Defense counsel did not contemporaneously object to these comments. "Generally, a prosecutor cannot make statements calculated to incite the passions and prejudices of the jurors." *Wogenstahl v. Mitchell*, 668 F.3d 307, 333 (6th Cir. 2012) (internal quotation marks omitted). A prosecutor "may not urge jurors to identify individually with the victims" or suggest "that if they do not convict, a crime wave or some other calamity will consume their community." *Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009). Nonetheless, a prosecutor is permitted to reference the evidence admitted at trial and ask the jury to draw reasonable inferences from it. *Id*. Here, the record contains evidence that Martin did, in fact, utilize a minor in his drug-trafficking business and conspire to kill a government witness who implicated him in the charged crimes. Further, assuming that the reference to "you" was improper, the remarks were not sufficiently flagrant to warrant reversal. In this regard, the remarks did not tend to mislead the jury, they were not extensive considering the defense counsel's line of argumentation, and the evidence of Martin's guilt was strong. In context, we conclude that the prosecutor's remarks did not affect Martin's substantial rights.

Hall claims three instances of prosecutorial misconduct. First, she argues that it was improper for the prosecutor to tell her that she would face additional criminal charges if she did not plead guilty quickly. This argument lacks merit. As the United States Supreme Court has explained, "[d]efendants advised by competent counsel and protected by other procedural safeguards are

presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). Although a defendant presented with the risk of a more severe punishment faces a difficult choice, this is permissible as a reality in any "legitimate system which tolerates and encourages the negotiation of pleas." *Id*. at 364. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id*. As here, where the prosecutor simply presented Hall "with the unpleasant alternatives of forgoing trial or facing charges on which [s]he was plainly subject to prosecution," her constitutional rights were not offended. *Id.* Plea negotiations are not vindictive where, as here, the accused has not alleged, much less proved, that she was deprived of her ability to accept or reject the prosecutor's offer. *Id*.

Hall's next claim of misconduct relates to the admissibility of incriminating statements that she made to police following her arrest. At a motion hearing, the prosecutor indicated that he did not intend to use those statements in its case-in-chief. In response, Hall withdrew her motion to suppress the statements, apparently on the mistaken belief that the statements could not be used for *any* purpose. When she later sought to bar the government from using her statements for any purpose, the government responded that even illegally obtained statements could be used to impeach her should she testify inconsistently with those statements at trial. Although Hall may have misinterpreted the government, the record clearly shows that the government's only promise was not to use the statements in its case-in-chief. To the extent that Hall misunderstood this to mean that the

government promised not to use the statements at all, her mistaken belief is in no way attributable to the prosecutor and is not evidence of misconduct.

Lastly, Hall complains that the prosecutor engaged in misconduct when he insisted, less than two weeks before trial, that any plea agreement be conditioned on Brooks also pleading guilty. The United States Supreme Court has not squarely addressed this type of "package deal" scenario. *See Bordenkircher*, 434 U.S. at 365 n.8 (noting that "a prosecutor's offer during plea bargaining of adverse or lenient treatment for some person other than the accused . . . might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider"). The position in this court, however, is that "there is no hard and fast rule against the government's predicating a guilty plea on the government's lenient treatment of persons other than the accused," and "the government may properly condition any plea in a case upon all defendants pleading guilty." *United States v. Carpenter*, 25 F. App'x 337, 343–44 (6th Cir. 2001). Moreover, as the First Circuit has explained, "[t]he difficulty with 'package deal' plea offers is *not* the fear that a defendant . . . will be 'forced' to go to trial. Rather, it is the opposite fear that the defendant will involuntarily waive his right to a jury trial because his codefendants will coerce him to accept the plea agreement." *United States v. Gonzalez-Vazquez*, 219 F.3d 37, 43 (1st Cir. 2000). The concern associated with the "package deal" simply has no application here, since Hall did *not* waive her constitutional right and *did* go to trial. *See id*. Indeed, "there is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial." *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977).

Because no constitutional right was compromised, Hall's refusal to accept the package deal offered by the prosecutor is not grounds for a new trial.

III.

Martin and Brooks argue that a variance of the indictment denied them a fair trial. We review de novo whether a variance has occurred. *United States v. Robinson*, 547 F.3d 632, 642 (6th Cir. 2008). Viewing the evidence in the light most favorable to the government, reversal of a conviction is warranted only if a variance occurred and affected the defendant's substantial rights. *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008). Where the issue is raised for the first time on appeal, however, reversal requires a showing of plain error; the defendant must show that the variance affected the outcome of the district court proceedings. *Id*.

A variance exists "[i]f an indictment alleges one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies." *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982) (emphasis added). "The principal considerations in determining the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003).

For the first time in this appeal, Martin argues that the evidence proved two unrelated drug conspiracies, one involving cocaine and the other involving marijuana. According to Martin, combining the separate conspiracies into a single offense in the indictment was prejudicial because

it made it difficult for him to determine the prosecution's theory of the case and prevented the jury from returning a partial acquittal.

It is true that the marijuana and cocaine were supplied by different individuals, but there were times when both drugs were supplied at the same location in Atlanta, and both drugs were transported to Knoxville for resale. Further, the fact that a large-scale drug-trafficking operation involves a web of individuals, each performing a particular role, does not insulate each participant from knowing the grander scheme or prevent them from sharing in the common goal of maintaining and furthering a profitable business. In this case, viewing the evidence in the light most favorable to the government "does not exclude the possibility" that the transactions of cocaine and marijuana were part of a cohesive operation to traffic drugs between Atlanta and Knoxville for financial gain. *United States v. Caver*, 470 F.3d 220, 236 (6th Cir. 2006).

Even assuming that a variance occurred, the variance did not prejudice Martin. Prejudice may be found where (1) the defendant is taken by surprise by the evidence presented at trial because of the degree of the variance or (2) the variance carries the risk that guilt will be transferred from the defendants involved in one conspiracy to the defendants involved in another conspiracy. *United States v. Budd*, 496 F.3d 517, 527 (6th Cir. 2007); *Caver*, 470 F.3d at 237. In this case, neither basis of prejudice is shown. Martin was tried alone, and, assuming the existence of two separate conspiracies, the evidence overwhelmingly implicated him in both. Accordingly, reversal is unwarranted on this ground.

In a similar argument, Brooks complains that the indictment charged him in connection with the Georgia-Tennessee conspiracy, but the government's proofs included testimony regarding events occurring in Mississippi, which he argues is a separate conspiracy. At trial, the government called a man named Tony Manning, who testified that he bought and sold drugs in Mississippi and Martin had sent Brooks to Mississippi to work for Manning. Smith testified that Brooks moved into the house on Rugby Avenue when he returned from Mississippi. Brooks argues that the government used the testimony regarding the Mississippi operation in hopes that it would bolster its case and further persuade the jury to convict him for the conspiracy charge set out in the indictment.

The Mississippi operation involving Manning does not appear to be connected in any significant way to the Georgia-Tennessee conspiracy headed by Martin, aside from Brooks being a common player. Thus, Brooks's claim that the government's proofs amounted to a variance from the indictment is well-founded. Nonetheless, he has not demonstrated prejudice. This is not a situation involving risk that guilt in a conspiracy for which Brooks was not involved would be transferred to him—the evidence implicated Brooks in both conspiracies. Any risk of prejudice was further stymied by the court's instructions to the jury. The jury was told that they were to decide whether to convict Brooks based on his actions and not the actions of others. The jury was also instructed regarding the difference between single and multiple conspiracies and its duty not to convict a defendant unless he or she participated in the charged conspiracy. A jury is presumed to follow its instructions. *Hofbauer*, 228 F.3d at 706.

Brooks also complains that the language of the indictment charged him for crimes occurring "on or about May 3, 2007," but the government's proofs extended to other dates. Because Brooks failed to preserve this issue, our review is limited to plain error. *United States v. Beasley*, 583 F.3d 384, 389 (6th Cir. 2009). "Where 'on or about' language is used, the government is not required to prove the exact date, if a date reasonably near is established. This is especially true where . . . the exact time when an offense was committed is not an essential element of the offense charged." *United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir. 1987) (internal citation and quotation marks omitted); *see United States v. Ford*, 872 F.2d 1231, 1236 (6th Cir. 1989). In this case, the government presented evidence that Brooks possessed firearms in April 2007, which is "reasonably near" May 3, 2007. And the exact time is not an essential element of being a felon in possession of a firearm. *United States v. Haas*, 35 F. App'x 149, 153 (6th Cir. 2002). Although we think that the indictment could have been more precise, we cannot say that the "on or about" language amounted to plain error affecting Brooks's substantial rights.

IV.

The next issue, raised by all defendants, is whether the indictment improperly charged them with two offenses under 18 U.S.C. § 924(c). In essence, defendants argue that the indictment allowed the jury to convict them twice based on the same firearm and possession conduct in violation of the protection against double jeopardy.

This argument fails because the two § 924(c) counts were predicated on two separate offenses: (1) conspiracy to possess with intent to distribute marijuana and other drugs and (2)

possession with intent to distribute marijuana. A substantive crime and a conspiracy to commit that crime are not the "same offense" for double jeopardy purposes; each requires proof of an element not required by the other. *See United States v. Barrett*, 933 F.2d 355, 361 (6th Cir. 1991) (explaining that a conspiracy requires an agreement to commit a crime but does not require an overt act). Further, because the focus of double jeopardy is on "the statutory elements of the charged offenses, not the transaction which gives rise to the charged offenses," the imposition of multiple punishments in connection with the same firearm and possession conduct is permitted. *Id.*

Martin relies on *United States v. Ehle*, 640 F.3d 689, 695 (6th Cir. 2011), which held that possessing and receiving pornography constitute the same offense for double jeopardy purposes, since one cannot receive pornography without possessing it. However, that principle does not apply here, where the two offenses at issue are *not* the same. *Barrett*, 933 F.2d at 361. Martin also relies on *United States v. Leichtnam*, 948 F.2d 370, 380–81 (7th Cir. 1991), in which the Seventh Circuit held that introducing additional handguns into evidence impermissibly broadened the scope of the indictment, which referenced a specific firearm, a Mossberg rifle. Here, however, the language charging defendants with two violations of 18 U.S.C. § 924 is not limited to a particular firearm and the government did not introduce firearms clearly outside the scope of the indictment, making *Leichtnam* inapposite. In short, the evidence adequately supports the conclusion that defendants possessed "a firearm" in furtherance of two separate drug-trafficking offenses.

All defendants rely on *United States v. Johnson*, 25 F.3d 1335, 1338 (6th Cir. 1994) (en banc), where this court stated that "possession of one or more firearms in conjunction with predicate

offenses involving simultaneous possession of different controlled substances should constitute only one offense under § 924(c)(1)." *Johnson* is distinguishable because the defendant there was convicted of two firearm offenses predicated on two possession crimes, not a possession crime and a conspiracy crime. *Id.* In this case, only *one* § 924(c) charge was predicated on possession with intent to distribute an illegal substance; the other was predicated on a *conspiracy* to possess with intent to distribute an illegal substance. Further, the predicate crimes here did not occur simultaneously. The possession was alleged to have occurred on a particular date, whereas the conspiracy was alleged to have occurred over a period of time. Thus, no error occurred.

V.

We next address whether the indictment failed to charge Martin with a federal offense of money laundering. Whether a charge in an indictment is defective or duplicitous is generally reviewed de novo. *United States v. Kakos*, 483 F.3d 441, 443 (6th Cir. 2007); *United States v. Lloyd*, 462 F.3d 510, 513 (6th Cir. 2006). However, because Martin failed to challenge the indictment before trial or object to the jury instructions, our review is limited to plain error affecting his substantial rights. *Kakos*, 483 F.3d at 445.

Martin claims that Count Fifteen of the indictment erroneously set forth "a hybrid charge" of promotion money laundering and concealment money laundering, which he claims is a non-existent offense. The federal money laundering statute, 18 U.S.C. § 1956(a)(1), prohibits financial transactions involving the proceeds of specified unlawful activity where the transaction was designed either (1) "to promote the carrying on of specified unlawful activity" or (2) "to conceal or disguise

. . . the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i), (B)(i). "These are alternative bases for a money laundering conviction; proof of intent to accomplish either will suffice." *United States v. Westine*, No. 92-3664, 1994 U.S. App. LEXIS 5144, 1994 WL 88831, at *2 (6th Cir. Mar. 17, 1994) (per curiam). "[W]here a penal statute . . . prescribes several alternative ways in which the statute may be violated and each is subject to the same punishment, . . . the indictment may charge any or all of the acts conjunctively, in a single count . . . ." *United States v. Hixon*, 987 F.2d 1261, 1265 (6th Cir. 1993) (internal quotation marks omitted). Count Fifteen charged Martin with a single federal offense (money laundering), which could be proved under either of two alternative theories (promotion money laundering or concealment money laundering). Accordingly, Count Fifteen was not defective.

Martin's reliance on *United States v. Combs*, 369 F.3d 925 (6th Cir. 2004), is misplaced. *Combs* addressed the issue whether 18 U.S.C. § 924(c) "sets forth two separate offenses or simply specifies alternative means for committing the same offense." *Id*. at 930. Based on the statutory text, legislative history, and differing proof required under the two prongs of the statute, the court concluded that § 924(c) criminalizes two separate offenses—"(1) *using or carrying* a firearm *during and in relation to* a drug trafficking crime, and (2) *possessing* a firearm *in furtherance of* a drug trafficking crime." *Id*. at 931. Critically, the reason that the charge in *Combs* failed to state a federal offense is because it intermixed elements of the two crimes. *Id.* at 934. By charging the defendant with "*possessing* a firearm *during and in relation to*" a drug trafficking crime, the government

mismatched the conduct of the first crime ("possessing") with the standard of participation of the second crime ("during and in relation to"), without fully charging either offense. *Id.*

In this case, however, the government did not mismatch elements of promotion money laundering with elements of concealment money laundering. Rather, the indictment charged Martin with promotion money laundering and concealment money laundering conjunctively, meaning that Martin could be convicted of money laundering, a single federal offense, upon proof of either alternative theory. Accordingly, Count Fifteen of the indictment stated a cognizable federal offense.

In a related argument, Martin argues that Count Fifteen was duplicitous. "An indictment is duplicitous if it sets forth separate and distinct crimes in one count." *United States v. Davis*, 306 F.3d 398, 415 (6th Cir. 2002). An indictment is not duplicitous, however, if it alleges multiple means of committing a single offense in one count. *United States v. Damrah*, 412 F.3d 618, 622 (6th Cir. 2005). Whether §§ 1956(a)(1)(A)(i) and (a)(1)(B)(i) are separate and distinct crimes or simply multiple means of committing a single offense is an issue of first impression in this court.

Although not directly on point, *Westine* sheds some light on the subject. In *Westine*, in the context of a sufficiency-of-the-evidence claim, this court characterized the subsections as "alternative bases for a money laundering conviction." *Westine*, 1994 WL 88831, at *2. Further, a majority of other circuits addressing the issue have concluded that the subsections do not establish separate crimes but rather set forth two alternative bases for committing money laundering. *See United States v. Seher*, 562 F.3d 1344, 1361 (11th Cir. 2009); *United States v. Garcia-Torres*, 341 F.3d 61, 65–66 (1st Cir. 2003); *United States v. Bolden*, 325 F.3d 471, 487 n.19 (4th Cir. 2003);

*United States v. Booth*, 309 F.3d 566, 571–72 (9th Cir. 2002); *United States v. Meshack*, 225 F.3d 556, 580 n.23 (5th Cir. 2000), *reh'g granted on other grounds*, 244 F.3d 367 (5th Cir. 2001); *United States v. Navarro*, 145 F.3d 580, 590–92 (3d Cir. 1998); *United States v. Holmes*, 44 F.3d 1150, 1155–56 (2d Cir. 1995).

Moreover, § 1956(a)(1) is not duplicitous if we apply an analysis similar to that employed in *Combs*. *Combs* analyzed § 924(c), which provides in pertinent part: "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" shall be guilty of a crime. The court first observed that the statute was divided into two dependent clauses separated by a disjunctive "or." *Combs*, 369 F.3d at 931. Each clause contained its own relative pronoun ("who") with its own modifying phrase ("during and in relation to" and "in furtherance of"). *Id.* Second, the court observed that an earlier version of the statute prohibited only "using or carrying a firearm during and in relation to" a drug-trafficking crime. *Id.* at 932. Congress modified the statute by adding the phrase, "possess a firearm in furtherance of the crime." According to the court, the congressional amendment was intended to delineate a new offense prohibiting mere "possession" of a firearm (a lower standard than "use") if "in furtherance of" a drug-trafficking crime (a higher standard than "during and in relation to" a drug-trafficking crime). *Id.* Lastly, the court considered it significant that different proofs are required depending on which firearm offense is alleged—"using or carrying . . . during and in relation to" a drug-trafficking crime or "possession . . . in furtherance of"

a drug-trafficking crime. *Id*. at 932–33. For these reasons, the court concluded that the statute criminalized two distinct offenses. *Id.* at 933.

The statute at issue in this case, § 1956(a)(1), provides in pertinent part:

> Whoever, knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction . . . with the intent to promote the carrying on of specified unlawful activity [promotional money laundering]; or . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [concealment money laundering]

shall be guilty of a crime. By contrast to the text at issue in *Combs*, the two dependent clauses that comprise § 1956(a)(1) modify the same relative pronoun ("whoever"). Further, whereas the statute in *Combs* contained two types of conduct ("use" and "possession") and two standards of participation ("during and in relation to" and "in furtherance of"), here, the same conduct ("conducts or attempts to conduct such a financial transaction") and standard of participation ("knowing that property involved in the financial transaction represents the proceeds of some form of unlawful activity") apply to both types of money laundering; only the *purpose* of the money laundering is differentiated ("to promote the carrying on of specified unlawful activity" or "to conceal . . . the proceeds of specified unlawful activity"). These features of the statute distinguish it from § 924(c) and support the prevailing view that §§ 1956(a)(1)(A)(i) and (B)(i) are multiple means of committing the single offense of money laundering. Therefore, they may be charged in a single count, as was done here.

VI.

We next address whether alleged sequestration violations resulted in an unfair trial for Martin or Hall. Following their convictions, both Martin and Hall filed motions for a new trial on the ground that the government improperly allowed its witnesses to coordinate their testimony while waiting in the courthouse holding cells, in violation of Federal Rule of Evidence 615. Rule 615 provides: "At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own." "The statutory purpose of the rule requiring sequestration of witnesses is to preclude coaching or the influencing of a witness' testimony by another witness." *United States v. Rugiero*, 20 F.3d 1387, 1392 (6th Cir. 1994). The district court denied both motions.

We review a district court's sequestration decision for an abuse of discretion. *United States v. Solorio*, 337 F.3d 580, 592 (6th Cir. 2003); *Rugiero*, 20 F.3d at 1394. A new trial is only warranted if it is determined that the error prejudiced the defendant's right to a fair trial. *Rugiero*, 20 F.3d at 1394.

Our sister circuits are divided regarding whether Rule 615 extends beyond the courtroom. *Compare, e.g., United States v. Sepulveda*, 15 F.3d 1161, 1176 (1st Cir. 1993) (concluding that the mandate of Rule 615 is limited to "the courtroom proper" but "leaves appreciable room for judicial innovation beyond the perimeters of that which the rule explicitly requires"), *with United States v. Prichard*, 781 F.2d 179, 183 (10th Cir. 1986) ("[A] sequestration order pursuant to Fed. R. Evid. 615 requires not only that witnesses be excluded from the courtroom, but that witnesses also refrain from

discussing their testimony outside the courtroom.").  And although this court is yet to take a position, *see Solorio*, 337 F.3d at 593; *Rugiero*, 20 F.3d at 1394, on the record before us, we find it unnecessary to resolve the issue today.

"[V]iolation of an order directing that witnesses be sequestered does not automatically bar a witness' testimony." *United States v. Gibson*, 675 F.2d 825, 835–36 (6th Cir. 1982).  Excluding testimony is only warranted in "particular circumstances" where there "are indications that the witness has remained in court with the consent, connivance, procurement or knowledge of the party seeking the testimony."  *Id.* at 836 (internal quotation marks omitted).  Thus, even assuming a sequestration violation, Martin and Hall have not alleged facts to support their assertion that the government consented to or had knowledge of the witnesses' coordination of testimony.

They have also failed to demonstrate prejudice.  First, the two affidavits that they filed do not indicate what testimony was allegedly coordinated, only that testimony was coordinated. *See United States v. O'Dell*, 805 F.2d 637, 640 (6th Cir. 1986) (explaining that newly discovered evidence must be "material" to warrant a new trial).  In addition, the jury listened to countless wiretapped conversations and was presented with the firearms, drugs, currency, and other contraband seized during the execution of the search warrants.  This evidence fully corroborated the testimony that Martin and Hall now claim was coordinated.  *See id.* (explaining that newly discovered evidence must be likely to produce an acquittal to warrant a new trial).  Accordingly, the district court properly denied their motions for a new trial.

VII.

Martin argues that the district court improperly equated his request for a sentencing variance to a request for a downward departure. We review unpreserved sentencing issues for plain error. *See United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc).

As Martin correctly observes, a departure is distinct from a variance:

> A Guidelines "departure" refers to the imposition of a sentence outside the advisory range or an assignment of a criminal history category different than the otherwise applicable category made to effect a sentence outside the range. Importantly, a departure results from the district court's application of a particular Guidelines provision, such as § 4A1.3 or § 5, Part K. A "variance" refers to the selection of a sentence outside of the advisory Guidelines range based upon the district court's weighing of one or more of the sentencing factors of § 3553(a).

*United States v. Grams*, 566 F.3d 683, 686–87 (6th Cir. 2009) (per curiam) (internal citations omitted).

Here, the district court sensibly construed Martin's request as seeking both a Guidelines departure and a sentencing variance, and it assessed Martin's arguments in the same manner that he presented them. The court first considered the factors set forth in § 3553(a) for determining the appropriateness of a variance. It also considered sections of the sentencing Guidelines relevant to Martin's request for a downward departure. The court's analysis was thorough and touched upon each and every one of Martin's bases for a departure or variance, including his assistance to fellow inmates and the conditions of his confinement. Finding neither a departure nor a variance appropriate, the court imposed a within-Guidelines sentence.

When reviewing a sentence for procedural reasonableness, the question for this court is limited to whether the district court neglected to consider the applicable Guidelines range or the factors listed in § 3553(a) and instead selected a sentence it deemed appropriate without such consideration. *United States v. Martinez*, 588 F.3d 301, 325 (6th Cir. 2009). Having reviewed the district court's analysis, no such neglect is discernable in this case. Martin's claim that the court improperly applied the standard for a departure when analyzing his request for a variance is simply unsupported; the court's analysis includes a discussion of each standard. Further, the same facts and analyses may be relevant to a determination whether either request is appropriate. *See Grams*, 566 F.3d at 686 (reasoning that "the same facts and analyses can, at times, be used to justify both a Guidelines departure and a variance"). Accordingly, Martin is not entitled to resentencing.

VIII.

Martin next argues that the district court improperly relied on acquitted conduct when sentencing him. Specifically, Martin complains that the district court enhanced his sentence based on its finding that he conspired to kill a government witness, a charge for which the jury acquitted him. Sentencing decisions are reviewed for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 46 (2007). To the extent that Martin's challenge raises legal questions, those issues are reviewed de novo. *See United States v. Johnson*, 569 F.3d 619, 623 (6th Cir. 2009).

Martin first argues that the court's reliance on acquitted conduct to increase his sentence violated his right to a jury trial under the Sixth Amendment. As he concedes, however, this court has already considered and rejected that argument. *United States v. White*, 551 F.3d 381, 385 (6th

Cir. 2008) (en banc).  In *White*, this court held that, "[s]o long as the defendant receives a sentence at or below the statutory ceiling set by the jury's verdict, the district court does not abridge the defendant's right to a jury trial by looking to other facts, including acquitted conduct, when selecting a sentence within that statutory range."  *Id*.

Alternatively, Martin argues that his sentence enhancement was improper under *United States v. Worex*, 420 F. App'x 546, 550 (6th Cir. 2011), an unpublished and therefore not precedentially-binding decision in which this court held that "the district court may consider uncharged conduct for sentencing purposes" only if found "by a preponderance of the evidence."  Unlike in *Worex*, however, the district court in this case *did* find by a preponderance of the evidence that Martin attempted to have Smith killed.  Accordingly, his reliance on *Worex* is misplaced, and resentencing is unwarranted.

IX.

We next consider whether the district court erred when it rejected Martin's and Brooks's challenges to the government's use of peremptory challenges and the composition of the jury venire under *Batson v. Kentucky*, 476 U.S. 29 (1986).  "We review a district court's determination of a *Batson* challenge with 'great deference,' under a clearly erroneous standard."  *United States v. Copeland*, 321 F.3d 582, 599 (6th Cir. 2003) (quoting *United States v. Buchanan*, 213 F.3d 302, 308–09 (6th Cir. 2000)).

With regard to the use of peremptory challenges, this court has explained:

[A] prosecutor is precluded from exercising a peremptory challenge on the basis of race.  Under *Batson*, once the opponent of a peremptory challenge has made out a

> prima facie case of racial discrimination, the burden shifts to the government to demonstrate a race-neutral reason for the exclusion of the juror.  The government is not required to persuade the court that its reasons for dismissing the juror were well-founded; rather, it need only demonstrate that its reasons were race-neutral. Once the government offers a race-neutral justification, the challenging party must demonstrate that the purported explanation is merely a pretext for a racial motivation. The burden of persuasion always rests with the opponent of the strike.

*Id*. (internal citations and quotation marks omitted).

On appeal, Martin complains that the district court improperly relied on the fact that the government did not strike all of the African-Americans from the jury panel.  Martin is correct that "'the presence of one African-American on the jury does not preclude a *Batson* challenge.'" *United States v. Torres-Ramos*, 536 F.3d 542, 558 (6th Cir. 2008) (quoting *United States v. Harris*, 192 F.3d 580, 587 (6th Cir. 1999)).  What he fails to mention, however, is that his *Batson* challenge was not precluded based on the presence of one African-American on the jury.  Rather, the district court assumed that Martin established a prima facie case and proceeded to the second step of the *Batson* analysis, in which the government was required to proffer race-neutral reasons for its use of peremptory challenges.  The court found that the government met this burden.  Once "the trial court has heard and ruled on the prosecution's asserted race neutral justification, 'the issue of whether the defendant made a sufficient prima facie showing becomes moot.'" *United States v. Simon*, 422 F. App'x 489, 494 (6th Cir. 2011) (quoting *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996)).  Thus, Martin's claimed error at the initial step of the analysis (establishing a prima facie case) is not properly before this court, and Martin does not argue that the remainder of the district

court's *Batson* analysis improperly relied on the fact that one African-American remained on the jury. Accordingly, remand on this issue is unwarranted.

Brooks argues that the district court erred in denying his *Batson* challenge because the government's race-neutral reason for excluding the only African-American juror was pretextual. The race-neutral reasons proffered by the government for excluding a juror were that she did not appear to understand the questions that were posed to her and might have difficulty reviewing the evidence impartially given that her grandson had been convicted of a drug offense in the same federal district court. These are undeniably race-neutral justifications, and, at this point, Brooks acknowledges that the burden shifted back to him to prove pretext. Yet, aside from the fact that the only excluded juror was African-American, Brooks fails to offer any evidence that the government's proffered justifications were racially motivated. Accordingly, Brooks did not carry his burden with regard to pretext, and his challenge was properly denied.

Both Martin and Brooks challenge the composition of the jury venire. In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show that (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) the underrepresentation is due to systematic exclusion of the group in the jury-selection process. *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008) (internal quotations omitted). Because Martin and Brooks "failed to produce any evidence that the under-representation of blacks in his jury venire resulted from systematic exclusion," they did not

establish a prima facie case. *United States v. Clark*, 112 F. App'x 481, 486 (6th Cir. 2004) (per curiam), *vacated on other grounds*, 545 U.S. 1101 (2005). Thus, the district court properly denied their claims.

X.

Martin and Hall challenge the sufficiency of the evidence against them, which we review de novo. *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002). Viewing the evidence in the light most favorable to the prosecution, the question is whether a rational juror could have found each element of the offense beyond a reasonable doubt. *United States v. Gooding*, 351 F.3d 738, 740 (6th Cir. 2003).

To support a conviction under 21 U.S.C. § 861(a), as an essential element, the government must prove that the defendant was at least eighteen years old at the time of the offense. Martin claims that the record is devoid of any substantive proof of his age. He is incorrect. Two pieces of documentary evidence introduced at trial list Martin's date of birth. Accordingly, a reasonable juror could have concluded that Martin was over the age of eighteen at the time of the offense.

Hall argues that the evidence was insufficient to show that she possessed a firearm in furtherance of a drug trafficking crime for purposes of § 924(c). As this court has explained:

> In light of Congress' intent that "in furtherance of" be a more stringent requirement than "during and in relation to," we emphasize that the possession of a firearm on the same premises as a drug transaction would not, without a showing of a connection between the two, sustain a § 924(c) conviction. In order for the possession to be in furtherance of a drug crime, the firearm must be strategically located so that it is quickly and easily available for use. Other factors that may be relevant to a determination of whether the weapon was possessed in furtherance of the crime include whether the gun was loaded, the type of weapon, the legality of its

> possession, the type of drug activity conducted, and the time and circumstances under which the firearm was found. The list of factors is not exclusive, but it helps to distinguish possession in furtherance of a crime from innocent possession of a wall-mounted antique or an unloaded hunting rifle locked in a cupboard.

*United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001) (internal citations omitted).

Here, agents recovered an assault rifle next to the bed shared by Hall and Martin. The firearm was not tucked away inside a drawer or cabinet, but was out in the open and readily available for use. The record also contains evidence that Martin provided the individuals involved in the drug-trafficking operation with firearms, creating a "specific nexus" between the firearms and the crimes. *Id*. at 462. Hall was involved in the drug-trafficking operation, often serving as a driver. The evidence suggests that she was knowledgeable of and exposed regularly to firearms, drugs, and proceeds from drug sales. It is not essential that Hall actually possessed a firearm, since constructive possession is sufficient. Based on the evidence, "a reasonable jury could infer that the purpose of the firearm was to provide defense or deterrence in furtherance of the drug trafficking." *Id*. at 462–63. At minimum, the evidence would allow a reasonable juror to conclude that Hall aided and abetted Martin in his possession of a firearm in furtherance of a drug-trafficking crime, as charged in the indictment.

Hall also challenges her convictions of conspiracy, possession with intent to distribute marijuana, and money laundering. To support a conviction of conspiracy to violate the drug laws, the government was required to prove that Hall agreed to violate the drug laws and knowingly and intentionally joined and participated in the conspiracy. *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005). With regard to the charge of possession with intent to distribute marijuana, the court

instructed the jury that it could convict Hall only if it found that she knowingly and intentionally possessed a substance that she knew to be marijuana and intended to distribute it. To support a conviction of money laundering (specifically, promotional money laundering), the government was required to show that Hall "(1) conducted a financial transaction that involved the proceeds of unlawful activity; (2) knew the property involved was proceeds of unlawful activity; and (3) intended to promote that unlawful activity." *United States v. Haun*, 90 F.3d 1096, 1100 (6th Cir. 1996).

Viewing the evidence in the light most favorable to the government, Hall drove Martin and other coconspirators to Atlanta to purchase drugs for resale in Knoxville; she was present during several drug transactions; she accepted drug proceeds, kept transactional records, and made deposits on behalf of the organization; she personally obtained marijuana; and individually-packaged bags of marijuana were seized from the residence she shared with Martin. The numerous wiretapped conversations confirm Hall's knowing and intentional participation in the crimes charged. Accordingly, the government presented sufficient evidence from which a rational trier of fact could find the essential elements of the crimes beyond a reasonable doubt.

Finally, we reject Hall's arguments that she lacked the requisite state of mind to commit the offenses because she "did only as Martin directed her to do." Hall may not evade responsibility for her actions by portraying herself as a physically helpless and vulnerable victim of Martin's manipulation. Her assertion that the only way she could support herself and her minor child was to partake in Martin's drug-trafficking operation is not worthy of belief. Hall knowingly participated in criminal activity and is accountable for her actions.

XI.

Hall and Brooks argue that imposing consecutive sentences for their two convictions under 18 U.S.C. § 924(c) constitutes cruel and unusual punishment. We review de novo whether a sentence is cruel and unusual in violation of the Eighth Amendment. *United States v. Caver*, 470 F.3d 220, 247 (6th Cir. 2006).

Under the "narrow proportionality principle," an Eighth Amendment violation will be found only in the limited case of an "extreme disparity" between the crime committed and the sentence imposed. *United States v. Moore*, 643 F.3d 451, 454–55 (6th Cir. 2011). The Eighth Amendment does not require strict proportionality or consideration of mitigating factors. *Id*. at 454. The court is also mindful that "[a] sentence within the statutory maximum set by statute generally does not constitute 'cruel and unusual punishment.'" *Id*. at 455 (internal quotation marks omitted). The legislature is given considerable deference in fashioning the type and duration of criminal punishments. *Id*. at 456.

Both Hall and Brooks received the mandatory minimum sentences of five and twenty-five years in prison for their two § 924(c) convictions, to be served consecutively. In essence, they argue that their punishments are disproportionate to the severity of the crimes, particularly considering their minor role compared to Martin, the organization's leader, who received the same punishment. Given that Hall and Brooks received within-Guidelines sentences, however, it cannot be said that their sentences for two convictions of § 924(c), for which the government presented sufficient evidence, were grossly disproportionate to the severity of the offenses. Because they have not

established the threshold requirement of gross disproportionality, it is unnecessary to compare their

sentences against other offenders, such as Martin, and reversal is unwarranted.  *Id*.

XII.

Hall filed a motion for a new trial, in part, on the basis that the government failed to disclose

a letter from Mashato Lamar to the Assistant United States Attorney, in violation of *Brady v.*

*Maryland*, 373 U.S. 83 (1963).  The district court denied the motion.

Although there is some confusion in the Sixth Circuit regarding whether a denial of a motion

for a new trial is reviewed de novo or for an abuse of discretion, there is no need to resolve the

discrepancy in this case because Hall's claim fails under the less deferential de novo standard.  *See*

*United States v. Douglas*, 634 F.3d 852, 860 (6th Cir. 2011).  "To establish a violation of *Brady*, the

petitioner has the burden of establishing that the prosecutor suppressed evidence; that such evidence

was favorable to the defense; and that the suppressed evidence was material."  *Carter v. Bell*, 218

F.3d 581, 601 (6th Cir. 2000).

As the district court pointed out, Hall knew about the letter at the time of trial because she

and her attorney were present when co-defendant Brooks used it to attack Lamar's credibility.  No

*Brady* violation occurred because the contents of the letter from Lamar to the Assistant United States

Attorney were known to Hall at the time of trial and used to discredit Lamar's testimony.  Thus, the

district court did not err when it denied Hall's motion for a new trial.

XIII.

Hall and Brooks raise claims of evidentiary error, which we review for an abuse of discretion. *United States v. Mayberry*, 540 F.3d 506, 515 (6th Cir. 2008). Hall argues that the district court erred when it refused to exclude evidence of a high-speed car chase in which she was not involved. To be admissible, evidence must first be relevant. *See* Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Although relevant, evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The district court did not abuse its discretion when it determined that the video recording was relevant. As the prosecutor explained, the chase was tied to the conspiracy; McKenzie was a participant in the conspiracy, and drugs and other contraband were seized from the vehicle. The evidence tended to make the existence of the conspiracy more probable than it would have been without the evidence. Nor did the district court abuse its discretion when it determined that the recording's probative value was not substantially outweighed by the danger that it might inflame the jury or mislead them. Although Hall was not involved in the chase, this point was made clear to the jury. There was no dispute that Hall was not involved in the chase and, indeed, was already in custody at the time it occurred.

Brooks argues that the district court erred when it admitted testimonial evidence from the officers who executed the search warrant at 1701 Rugby Avenue regarding the presence of large-size

clothing found in the back bedroom where Brooks was apprehended. The testimony was offered to rebut Brooks's claim that he was nothing more than a casual visitor at the house. Although the clothes were not photographed or taken into evidence, the court allowed an officer to testify that the clothes were very large and, in his opinion, could only belong to Brooks. At trial, one officer described Brooks as "a big man, 300-plus pounds," which was significantly larger than any other individual arrested on May 3, 2007. Fatal to Brooks's claim is the abundance of other evidence on the record establishing his guilt and status as a resident at 1701 Rugby Avenue. The jury heard that Brooks and Smith lived together in the "weight house," Martin instructed Brooks to provide security for the "weight house" in light of the volume of drugs and money that moved through that location, Brooks was armed while inside the "weight house," and Brooks would handle drug transactions in Smith's absence. Thus, error, if any, in allowing the testimony was harmless.

## XIV.

We next consider whether the district court erred when it denied Brooks's motion for a bill of particulars. "To make a successful challenge to a district court's denial of a motion for a bill of particulars, 'the defendant must show not only that the court abused its discretion, but that defendant actually suffered surprise or other prejudice at trial.'" *United States v. Crayton*, 357 F.3d 560, 568 (6th Cir. 2004) (quoting *United States v. Salisbury*, 983 F.2d 1369, 1375 (6th Cir. 1993)).

The trial court did not abuse its discretion when it ruled that the indictment adequately described the charges with sufficient detail. A bill of particulars is meant "to minimize surprise and assist [the] defendant in obtaining the information needed to prepare a defense and to preclude a

second prosecution for the same crimes. [It] is not meant as a tool for the defense to obtain detailed disclosure of all evidence held by the government before trial." *Id*. (internal citation and quotation marks omitted). Further, it is unclear how the specificity in the indictment (or lack thereof) hindered Brooks's ability to properly prepare for trial, since he received extensive discovery from the government. Brooks was privy to copies of numerous recorded conversations spanning a period of time such that he could not have been surprised when the government presented evidence from dates other than May 3, 2007. And because Brooks did not rely on the specificities of the firearms at issue to defend himself, it is unclear how he could have benefitted from greater particularity in the indictment. Finally, Brooks's claim that he did not know who he was alleged to have aided and abetted to possess firearms in furtherance of a drug-trafficking crime lacks credibility. Brooks was arrested along with Smith, Martin, and Hall at the "weight house," where agents seized drugs, drug paraphernalia, and firearms. Accordingly, Brooks could not have been reasonably unaware that these were the individuals he was alleged to have aided and abetted in the violation of § 924(c).

## XV.

The final issue is whether the cumulative effect of the claimed errors entitle Martin to reversal of his convictions. Martin is not entitled to reversal of his convictions based on cumulative error where, as here, "there are simply no errors to cumulate." *See Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) (en banc) (citing *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004)).

## XVI.

For these reasons, we affirm defendants' convictions and sentences.