NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 14a0784n.06

Case No. 11-6123

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| DWAUNE GRAVLEY, | ) | KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

**FILED**
Oct 15, 2014
DEBORAH S. HUNT, Clerk

BEFORE: SILER, BATCHELDER, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** After a nine-day trial, a jury found Dwaune Gravley guilty of all charges in a six-count indictment: (1) conspiracy to commit murder, (2) premeditated murder, (3) criminal assault, (4) conspiracy to obstruct justice, (5) obstruction of justice, and (6) misprision of a felony. The United States District Court for the Eastern District of Kentucky subsequently sentenced Gravley to life imprisonment and ordered him to pay $19,951.48 in restitution. Gravley now appeals, asserting seven claims through counsel and three claims in a pro se supplemental brief. For the reasons that follow, we **AFFIRM** the District Court's judgment.

## I.    FACTUAL BACKGROUND & PROCEDURAL HISTORY[1]

### A.    Shamoni Peterson's Death.

Big Sandy is a federal penitentiary located in Inez, Martin County, Kentucky, at which Gravley, Darryl Milburne, and Darone Crawford were inmates and shared Cell D-240. Cell D-240 is on the D-range of Big Sandy's special housing unit (SHU), which is set apart by a series of doors that must be opened from the facility's control center. The indictment with which Gravley later was charged alleged that a Big Sandy correctional officer (CO) came to the SHU on November 12, 2006 to ask Gravley and Milburne if another inmate, Shamoni Peterson, could be placed in their cell. Gravley consented, and, according to Crawford, then said to Milburne, "We're going to eat his food." Crawford understood this statement to mean that Gravley and Milburne were "going to do something to [Peterson]," "[p]hysically[.]"

Crawford later testified that, soon after Peterson was placed in the cell, Gravley and Milburne assaulted Peterson and killed him:

Crawford:    [Peterson] was on the toilet reading a magazine and Milburne got down and put him in a headlock.

. . .

Lawyer:    Okay. Where was Mr. Gravley at that time?
Crawford:    On the bunk.
Lawyer:    Okay. What had Mr. Gravley been doing before the attack started?
Crawford:    He was just laying there.
Lawyer:    Okay. What was he doing prior to that?
Crawford:    Just laying there on the bunk.
Lawyer:    All right. Were there any phone calls made?
Crawford:    Yea. Like he—he made a phone call. He got up and made a phone call, and then he went back to the bunk.

---

[1]This case consists of a lengthy factual and procedural history that culminated below in a nine-day trial, for which Gravley initially had counsel appointed to him but in which he ultimately chose to proceed pro se. The factual summary that follows is limited and intended only to provide context for Gravley's claims. Additional facts material to the disposition of the claims are provided as necessary in the analysis of each claim.

Lawyer:     Okay. And then what happened after that?

Crawford:   Milburne got down off the bunk and put the dude in a headlock.

Lawyer:     Put who in a headlock?

Crawford:   Peterson.

Lawyer:     Okay. Had Mr. Peterson attacked Mr. Milburne?

Crawford:   No.

Lawyer:     Okay. Well, describe for the jury the attack on Mr. Peterson.

Crawford:   Milburne grabbed him in a headlock and Gravley just came over and started hitting him.

Lawyer:     Okay. Go ahead. What happened during the attack?

Crawford:   He hit him and picked him up and was throwing him around and hitting him, slamming him around. And after—after he—after he passed, he cleaned the body up and cleaned all the—all the evidence and stuff up.

Lawyer:     Okay. Well, before we get to that, let's talk a little bit more about the attack. What did you see Mr. Milburne do?

Crawford:   He just put him in a headlock and started hitting him, like from the side.

Lawyer:     Okay. Where did you see him hit Mr. Peterson at?

Crawford:   In the head.

Lawyer:     Okay. Where was Mr. Peterson's body during the assault? Was he standing up? Was he laying down?

Crawford:   Mr. Peterson was like this (indicating), he was bent over, and then Gravley came and started hitting him.

Lawyer:     Where did Mr. Gravley hit Mr. Peterson at?

Crawford:   Like he was hitting him in the face too.

Lawyer:     Okay. How long did the assault last?

Crawford:   Probably, like 20 minutes.

Lawyer:     Okay. Where were you during the assault?

Crawford:   By the—by the shower?

Lawyer:     Okay. Did you participate in the assault?

Crawford:   No.

Lawyer:     All right. Did it become apparent at some point that Mr. Peterson was in a lot of trouble? I mean physically that he was hurt.

Crawford:   He was screaming, like screaming for his life, like, like "Please stop."

Lawyer:     What did he say exactly?

Crawford:   He was like his heart was hurting or something.

Lawyer:     . . . . Did he attempt to fight back?

Crawford:   No. He couldn't.

Lawyer:     Why couldn't he?

| | |
|---|---|
| Crawford: | Because it was—it was two people on him. |
| Lawyer: | Okay. What words did he say? Did he say words to Mr. Gravley or to Mr. Milburne specifically? |
| Crawford: | He said it to Gravley. |
| Lawyer: | What did he say to Mr. Gravley? |
| Crawford: | He said, "Please stop. Deuce, please stop. You're hitting me too hard," and all that. |
| Lawyer: | You said "Deuce." Now, who is Deuce? |
| . . . | |
| Crawford: | Dwaune Gravley.[2] |
| . . . | |
| Lawyer: | All right. While Mr. Peterson is making these statements to Gravley, does Gravley do anything in response? |
| Crawford: | No. |
| Lawyer: | Did there come a point in time that the beating stopped? |
| Crawford: | Yeah. |
| Lawyer: | What caused it to stop? |
| Crawford: | He was—the dude, it looked like he was gone. |
| Lawyer: | It what? |
| Crawford: | He was dead. |

According to Crawford, Milburne then put a T-shirt in Peterson's mouth and cupped a hand over his face even though "it was like he was already dead already." All the while, said Crawford, Gravley was "standing there." Crawford made no attempt to assist Peterson "[b]ecause [he] kn[e]w they probably would have did [sic] something to [him]." Afterward, however, he helped Gravley and Milburne remove the evidence of their actions:

| | |
|---|---|
| Lawyer: | Okay. After the assault, what did Mr. Gravley or Mr. Milburne do? |
| Crawford: | They cleaned it up. |
| Lawyer: | Okay. You are going to have to tell us how that happened. What did Mr. Gravley do to clean up after the assault? |
| Crawford: | They just—they took some rags and stuff and cleaned him up, because they knew he was gone. |
| Lawyer: | When you say "they knew he was gone," knew what? What was that? |
| Crawford: | They knew he was dead. |

---

[2]*See infra* note 6 and accompanying text.

- 4 -

Lawyer: Okay. What did Mr. Gravley do to clean him up with a cloth?
Crawford: They just took some soap and rags and cleaned him up.
Lawyer: What part of his body did he clean?
Crawford: The whole body.
Lawyer: Okay. Did they take his clothes off or—
Crawford: Yeah.
Lawyer: --change his clothes or?
Crawford: Yeah.
Lawyer: Okay. You have to tell us about that. What did you see them do?
Crawford: He moved him and picked him up and put clothes on him after they cleaned him up.
Lawyer: Okay. What did you see Mr. Milburne do?
Crawford: He was doing the same thing, cleaning him up.
Lawyer: Okay. Did you participate in cleaning him up?
Crawford: Yeah.
Lawyer: Why did you do that?
Crawford: Because I just did it. I just helped them because I—I just did it.
. . .
Lawyer: Did you have any concerns of what would happen to you if you didn't help?
Crawford: No. . . . I just did it. I seen them doing it. And I wanted—I wanted to try—to try to get out of the cell, but I couldn't.
Lawyer: What do you mean, you wanted to try to get out of the cell? Why did you want to get out of the cell?
Crawford: Because I wasn't taking the charge.
Lawyer: You were afraid you were going to get charged with assaulting Mr. Peterson?
Crawford: Yeah.

Crawford also testified that Milburne asked him to cut Milburne's hands with a razor blade. Crawford did not know where the razor blade had come from or why Milburne had made the request, but he complied:

Lawyer: Where did that razorblade come from?
Crawford: I don't know . . . . Milburne asked me to cut, just to cut his hand, like. I didn't know what for, because I didn't see nothing done with the razor.
Lawyer: Okay. And did you cut Mr. Milburne's hands with the razorblade as he asked?

Crawford:     He asked me and I just—it was just a little scrape. I did it. And he put it in his sock.

Lawyer:       Mr. Milburne put it in whose sock?

Crawford:     In Peterson's sock.

. . .

Lawyer:       Was there any time that the four of you were in the cell that Mr. Peterson attacked either you, Mr. Milburne, or Mr. Gravley with a razorblade?

Crawford:     No.

The following morning around 5 o'clock, Peterson was found dead in Cell D-240. A medical examiner, Cristin Rolf, observed that Peterson had sustained several "injuries that [we]re inflicted . . . through blunt force injury, through pressure of a blunt object placed on the body. There were also injuries to the mouth . . . the mouth shows the most injury." Dr. Rolf concluded that the cause of Peterson's death was "asphyxia, due to the inability to be able to move his chest wall or his diaphragm to breathe. Also, the mouth area was . . . forcibly covered."

According to Crawford, after prison officials discovered Peterson's body, they immediately separated Crawford, Gravley, and Milburne and questioned Crawford:

Lawyer:       Okay. So when the COs came around the next morning, tell us what happened.

Crawford:     They just—they came—they came to the cell. And after that, they—when they opened the cell up, they just found his body and took us downstairs and put us in the outside rec cages.

Lawyer:       Put you where?

Crawford:     The outside rec cages.

Lawyer:       The rec cages?

Crawford:     Yeah.

Lawyer:       Okay. Did they separate the three of you?

Crawford:     Yeah.

Lawyer:       Okay. Were you questioned by correctional officers or other agents about what happened to Mr. Peterson?

Crawford:     Yeah.

Lawyer:       Okay. Did you initially tell them what happened?

Crawford:     Yeah. Because the way it was, it was like they was trying to put it on me.

> Lawyer:      Who was trying to put it on you?
> Crawford:    Them, Gravley[.]

## B.      Investigation and Indictment.

Big Sandy's Special Investigation Services (SIS) opened an investigation into Peterson's death the same day.  In the course of that investigation, SIS discovered razor blades in Cell D-240 and on Peterson's person.  SIS also discovered that Milburne had suffered lacerations on his arms that were consistent with razor blade cuts.   Additionally, as the District Court later explained,

> [i]n the days and weeks that followed [Peterson's death], allegations arose of misconduct by Big Sandy officials in connection with the placement of Peterson in [Cell D-240] and the hours surrounding his death. In one fashion or another inmates are said to have told investigators and senior Big Sandy officials that prior to Peterson's placement in Cell D-240, corrections officers knew he belonged to a rival gang of Gravley, Milburne, and Crawford's and had personally quarreled with these inmates.  One inmate, Eddie Pierre, recounted how officers had previously solicited his assistance in assaulting Peterson because of problems Peterson had caused for the officers.  Pierre claimed that during the assault in cell D-240, a corrections officer observed the fight and smiled.  Other inmates claimed to have alerted Big Sandy staff of the altercation in cell D-240 as it occurred and were ignored. Inmate Patrick Howell claims he observed a prison guard collect clothing and other evidence in two trash bags and remove them from the cell to be destroyed. Because of the foregoing, the inmates believed that officers intentionally placed Peterson in [Cell D-240] so that he would be assaulted and possibly killed.

These allegations of misconduct led the Bureau of Prisons (BOP) After-Action Team and the U.S. Department of Justice Office of the Inspector General (OIG) to conduct their own investigations.

> The OIG's investigation was led by Special Agent Patrick Schumacker and commenced on November 30.  In the course of its investigation, OIG staff interviewed inmates and Big Sandy staff, including the warden.  The OIG, the warden, SIS, and the After-Action Team reviewed prison video of SHU corridors from November 12 and 13 [of 2006].  The OIG ultimately concluded that Big

Sandy personnel did not intentionally place Peterson in [Cell D-240] with the purpose of initiating a fight, ignore the fight while it was ongoing, or intentionally destroy evidence of the fight. It also found inmate Pierre's allegations to be not credible. Nevertheless, the OIG did conclude that officers had been negligent and derelict in their duties and referred several potential administrative violations to the BOP for further action.

A federal grand jury subsequently returned an indictment against Gravley and Milburne for Peterson's death, charging them with conspiracy to commit murder, in violation of 18 U.S.C. § 1117; premeditated murder, in violation of 18 U.S.C. § 1111(a) and (b); and assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a)(6). Crawford, however, was not charged. A superseding indictment later added charges against Gravley for conspiracy to obstruct justice, obstruction of justice, and misprision of a felony.[3] After a nine-day trial, a jury found Gravley guilty of all charges.[4]

## C. Cameras.

When Peterson died, there were approximately 300 video cameras at Big Sandy, located at various points throughout the facility. As the District Court explained,

[t]he images captured on camera are transmitted into a VICON Kollector, a device containing six hard-drives designed for recording the camera images. A Kollector's hard-drives hold a minimum of 14 days of recorded activities before reaching capacity, and once filled to capacity, the Kollector overwrites the oldest images.[5] Thus, to preserve footage captured on the Kollectors, the footage must be transferred to a CD. Selecting, downloading, and recording images to a CD is the function of SIS officers. The process of saving footage begins with an SIS officer pulling up the footage from the Kollector's hard-drive. Next, the SIS officer views the footage from the Kollector and determines which portions

---

[3]The original indictment also included charges for obstruction of justice—one of which was for intimidating Crawford into assisting in the alleged obstruction—against Gravley and Milburne that later were dismissed by the District Court.

[4]Milburne pleaded guilty to second-degree murder and was sentenced before Gravley's trial. At Gravley's trial, however, Milburne testified in Gravley's favor.

[5]Surveillance footage is saved on Big Sandy's hard-drive for 15-30 days.

should be saved. The officer then transfers the selected footage to a computer tower located in the SIS office. From the computer tower, the footage is saved to a CD.

Although the corridors of the SHU were equipped with cameras, the unit's individual cells were not. During discovery, Gravley requested video footage from the SHU corridors for November 12 and 13, 2006. But, "[f]or reasons that are unclear," the vast majority of the footage, which would have lasted approximately nineteen hours, was not preserved. Instead, "[o]nly 27 minutes of the footage survive[d]" and was disclosed to Gravley; the remainder was overwritten. Accordingly, Gravley moved to dismiss the charges against him, raising allegations of BOP wrongdoing.

As the District Court recounted, however, "[s]everal people viewed the entire footage [from November 12 and 13, 2006] before it was overwritten." "Warden Suzanne Hastings, members of the SIS, members of the After-Action Team, and Special Agent Schumacker reviewed the footage before it was erased. Both Agent Schumacker and Warden Hastings made time lines of the events based on the entire footage. Their time lines d[id] not corroborate Gravley's allegations." Additionally, Agent Schumacker had asked the BOP to preserve any video footage that was reviewed. Consequently, the District Court concluded, Gravley could establish neither that the lost footage was "materially exculpatory," *United States v. Wright*, 260 F.3d 568, 570-71 (6th Cir. 2001) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)), or that it had been overwritten in bad faith, *id.* at 571 (citing *Arizona v. Youngblood*, 488 U.S. 51, 57-58). The court therefore denied Gravley's motion to dismiss.

**D.     Alleged Admissions.**

1.     <u>David Johnson</u>.

At Gravley's trial, David Johnson, another Big Sandy inmate and an orderly, testified that Gravley had admitted to him in "several" conversations that Gravley and Milburne had attacked Peterson. Johnson had met Gravley in November of 2006; according to Johnson,

> [Gravely] told me that 'they." He didn't—I can't recall if he actually mentioned all three of them attacked Mr. Peterson. But he did mention "they." And I'm—I was assuming, or I'm assuming that "they" meant everyone that was in the cell. But they beat, kicked, and stomped Mr. Peterson until, I guess, a final kick to his throat by—by, by Mr. Gravley, and Mr. Peterson stopped moving.

Johnson also testified that both Gravley and Milburne were members of the Bloods gang and that Gravley, who was senior to Milburne in the gang, had ordered Milburne to attack Peterson and to take responsibility for the attack. In exchange for the attack, Milburne was to "get rank" in the gang and to be paid as much as $60,000.00.

About a year before Gravley's trial, Johnson had told an investigator that he "hadn't heard that" Gravley or Milburne had attacked Peterson and "d[id]n't know where [that information] came from[.]" Johnson also told the investigator "[t]hat Mr. Gravley had nothing to do—told [Johnson] he had nothing to do with [Peterson's death]." At trial, however, Johnson insisted that what he had told the investigator was false: "I was trying to protected Deuce, I'm sorry, Mr. Gravley because of my grievance with the federal government."[6] As Johnson explained, he had an incentive to protect Gravley:

---

[6]The indictment against Gravley identified him as "Dwaune [Gravley], aka Deuce," and there was testimony at Gravley's trial that he referred to himself as "OG [Original Gangster] Deuce." (Gravley's name originally was misspelled "Gravely.") Johnson's alleged "grievance with the federal government" had to do with his having been promised support in pursuing a sentencing reduction under Federal Rule of Criminal Procedure 35 in a previous, unrelated matter and not having gotten it. Gravley's motion to strike "Deuce" from the indictment was unsuccessful.

| | |
|---|---|
| Lawyer: | Is there a downside, from an inmate's standpoint, for testifying against another inmate in a case of this nature? |
| Johnson: | Yes. There is—there is a big downside. |
| Lawyer: | And what is that? |
| Johnson: | I guess the ultimate would be murder, someone killing me for testifying in this trial. |
| Lawyer: | Is there kind of an unwritten rule within the institutions about one inmate testifying against another? |
| Johnson: | Yes, there is. |
| Lawyer: | And what is that? |
| Johnson: | Inmates are called—are labeled snitches.  But in the federal system, they don't actually call them a snitch, they call them hot, h-o-t. |
| Lawyer: | Okay. |
| Johnson: | And if you are labeled a snitch or hot, there are consequences. |

2.    Andre Player.

Gravley was transferred to a facility in Manchester, Kentucky, where he spoke with another inmate, Andre Player, after Peterson's death.  Player testified that Gravley boasted about having been the most senior member of the Bloods gang at Big Sandy, describing himself as "the head guy," and said that a gang-related murder had happened in his cell there.  Gravley allegedly "told [Player] that he—he made the murder happen, that he orchestrated it."  According to Player,

> [t]here was—there was other inmates in the cell with [Gravley].  And him having a high rank in the gang that he was in, he had another guy in his cell commit the murders with—I believe he said at the time it was knives.

Player also recalled that the name of the murdered inmate was "Peterson"; that he had heard Peterson's name only from Gravley; and that "[t]here was another guy, who actually is the guy that [Gravley] told me he had do the murder; I believe his name was Milburne."

3.      Cory Thomas and Paul Woods.

Manchester inmates Cory Thomas and Paul Woods testified similarly regarding information that Gravley allegedly had told them about Peterson's murder. According to them, Gravley said "that Mr. Peterson had—had disrespected the Bloods by saying, 'F the Bloods' or whatever." (PageID # 2105 (Thomas); *accord* 2163-64 (Woods) ("Well, it started off when [Gravley] had informed me that Peterson had said, 'F**k'—excuse me. . . . Is it okay to say that? . . . He explained that Peterson had said, 'F Bloods.'").)  In retaliation, they testified, Gravley ordered Milburne to assault Peterson:

| | |
|---|---|
| Lawyer: | Did [Gravley] tell you who was also in the cell and perhaps even before Mr. Peterson came into the cell? |
| Thomas: | All he kept saying was his little brother. He said it was his little brother that was in the cell with him. |
| . . . | |
| Lawyer: | Did he ever identify by name? |
| Thomas: | Milburne. |
| . . . | |
| Lawyer: | Now, did you understand that to mean that Mr. Milburne was his true younger brother? |
| Thomas: | Yes. He did say that. |
| Lawyer: | Well, by true younger brother, I mean with the same parents. |
| Thomas: | Oh. No. I knew that it was his—his Blood brother, as far as his gang-related brother. |
| Lawyer: | Can you explain a little bit more of what that means, in terms of the Blood gang and a little brother. |
| Thomas: | It is—it is like he is the big brother and Milburne's the little brother. So, basically, he is the shot caller and if he is, you know, to pass down an order, that Milburne has to follow it. |
| Lawyer: | Did he tell you whether or not he, Mr. Gravley, gave the order or the shot call to Mr. Milburne? |
| Thomas: | Yes. |
| Lawyer: | What did he say? |
| Thomas: | He was just like he had gave the order. Because Mr. Milburne was going to get rank with the Bloods; that's how he earned his stripes with the Bloods to become a lieutenant. |

| Lawyer: | If Milburne did what? |
|---|---|
| Thomas: | Assaulted Peterson. |

…

| Lawyer: | Where was Mr. Peterson when Mr. Gravley gave the nod? |
|---|---|
| Thomas: | He was sitting on top of the toilet. |
| Lawyer: | And who did Mr. Gravley give the nod to? |
| Thomas: | Milburne. |
| Lawyer: | And once he gave that nod, did he then tell you what happened? |
| Thomas: | He—they put him in a headlock and just beat him, was punching on him and stuff. |
| Lawyer: | Did Mr. Gravley— |
| Thomas: | —stomping on him. |
| Lawyer: | I'm sorry. I didn't mean to cut you off. |
| Thomas: | And stomping on him and—and punching him and just choking him and stuff. |

. . .

| Lawyer: | Okay. Did Mr. Gravley mention anything about a shirt, placing it somewhere on— |
|---|---|
| Thomas: | To stop Mr. Milburne from—from hearing the screaming, that Mr. Mil—I mean, Mr. Peterson was screaming. |
| Lawyer: | Okay. |
| Thomas: | They placed a shirt in his mouth. |
| Lawyer: | And to stop him from? |
| Thomas: | Screaming and being heard. |

(PageID # 2105-11; *accord* 2163-66 (Woods).) Woods also testified that Gravley told him that

Crawford, the third inmate, "participated in [the assault] by kicking [Peterson]."

### E.    Additional Witnesses.

In motions for writs of habeas corpus *ad testificandum* before his trial, Gravley sought to

compel the presence of several fellow inmates, among them Otis Smith, Matthew Davis, and

Andre Bruno, to testify that they did not hear Peterson scream Gravley's name. He also expected

Bruno to testify that there was no animus between the Bloods and the Washington, D.C.-

affiliated gang to which Peterson allegedly had belonged. Additionally, all of the witnesses were

to "testify that they were never asked by staff to take Peterson as a cell-mate." A federal

magistrate judge denied the motions, concluding that although the proposed testimony "might be relevant to [Gravley's] case," Gravley had not demonstrated that the witnesses were "necessary for an adequate defense" as required by Federal Rule of Criminal Procedure (Criminal Rule) 17(b). The District Court upheld the denial in ruling on Gravley's subsequent motion for reconsideration and also denied Gravley's renewed motion for the writs at trial.

### F.    Sequestration.

During trial, Player admitted that he was transported to court with Thomas and Woods. According to Player, the trip lasted two to three minutes, during which the witnesses "discuss[ed] why [they] were there." Gravley sought a mistrial on that basis, asserting that the Government had violated the District Court's sequestration order. The District Court denied the motion, however, explaining that "the Rule of Exclusion of Witnesses . . . . requires [only] that witnesses are not allowed to remain in the courtroom during the testimony of other witnesses."

### G.    Jury Instruction.

Near the conclusion of his trial, returning to the subject of the overwritten video footage, Gravley requested that the District Court provide the jury with the following instruction:

> If you have heard testimony about the obstruction of evidence, video evidence, if you believe that BOP personnel concealed evidence, you may consider this conduct along with all other evidence in deciding whether the Government has proof beyond a reasonable doubt that the—of the crimes charged.

The District Court refused to give the instruction, however, concluding as follows:

> [T]hat instruction addresses, in essence, an inference that can be drawn by the jury in the instance in which there is flight or concealment of evidence, destruction of evidence on behalf of the defendant. You have asked for that instruction not on behalf of the defendant but, in essence, on behalf of the Bureau of Prisons in this particular case. . . . This is not an instruction that would be appropriate to give or an appropriate inference for the jury to draw as it related to the BOP in this particular case. And so since you are asking for an instruction not

for a defendant, not for an unindicted co-conspirator, and I am not even sure it would be appropriate in that particular instance, I don't think it is appropriate to include and I will deny your request for that particular instruction.

## H.     Motion for Acquittal or, Alternatively, for a New Trial.

Before he was sentenced, Gravley filed a pro se motion and two supplemental motions for acquittal or for a new trial. He contended that, under Criminal Rule 29, the evidence at trial was insufficient to support the jury's verdict against him and that, alternatively, under Criminal Rule 33, the evidence at trial "preponderate[d] heavily against the verdict." *United States v. Roland*, 233 F. App'x 476, 482 (6th Cir. 2007) (citing *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988)).

At trial, one of the defenses that Gravley asserted was that he had pushed the duress alarm inside Cell D-240 when the fight between Milburne and Peterson began. The Government challenged this defense, presenting testimony that "a prison employee must use a key to reset the alarm outside of [any] cell" in which a duress alarm is pushed. Agent Schumacker, who had observed the overwritten video footage from the SHU corridors, testified that the footage "did not show any such 'resetting' outside of [C]ell [D-]240."

For his part, Gravley pointed to Milburne's testimony that Gravley had, in fact, pushed the duress alarm. He also relied on testimony "that an activated duress alarm does *not* have to be 'reset' outside of the cell." Crawford testified during trial that there was no duress button or alarm inside Cell D-240 that an inmate could hit. According to Gravley, the inconsistency of this testimony demonstrated the insufficiency of the Government's proof.

But the District Court concluded that Gravley's challenges went to the weight, rather than to the sufficiency, of the evidence, which it was not allowed to consider under Criminal Rule 29, and which it did not find availing under Criminal Rule 33. According to the court, "The jury

heard both Milburne and Crawford's testimony, and it was free to accept either the [G]overnment's theory regarding the duress alarm (i.e. that it exists but was not pushed) or Gravley's theory regarding the alarm."

Gravley also contended that, because it allowed Milburne to plead guilty to the second-degree murder of Peterson,[7] the Government was judicially estopped from charging him with Peterson's murder. Gravley also asserted that he was entitled to a new trial because the Government withheld the information that Woods previously had lied to a grand jury in Tennessee about an unrelated matter. As the District Court explained, however, "Milburne's plea agreement d[id] not exclude the possibility that he was assisted by Gravley or ordered by Gravley to commit the murder." The court also concluded that Woods's perjury, while useful as impeachment evidence, was not likely material nor likely to have produced Gravley's acquittal because other witnesses corroborated Woods's testimony and because the Government had offered other evidence of Gravley's guilt. *See United States v. White*, 861 F.2d 994, 997-98 (6th Cir. 1998). Accordingly, the District Court denied Gravley's motion.

The District Court subsequently sentenced Gravley to life imprisonment, ordered him to pay $19,951.48 in restitution, and entered a final judgment on September 13, 2011. Gravley timely appealed.

## II. ANALYSIS

Gravley raises seven claims on appeal through counsel in his principal brief and three claims in a supplemental pro se brief. We resolve each claim against Gravley as follows:

---

[7]*See supra* note 4 and accompanying text.

A.    **Claims Through Counsel.**

Writs of Habeas Corpus *Ad Testificandum*:   Gravley's **first claim** on appeal is that the District Court committed reversible error in denying his motions to compel the presence and testimony of Smith, Davis, and Bruno.   His first disagreement with the Government in this regard is about the applicable standard of review: Gravley contends that this Court should review the claim de novo, and the Government asserts that the proper standard is abuse of discretion.

In denying Gravley's motion, the District Court relied on Criminal Rule 17(b).   This rule provides that if a defendant shows (1) an inability to pay a witness's fees and (2) "the necessity of the witness's presence for an adequate defense," a district court must issue a subpoena for that witness.   Fed. R. Crim. P. 17(b).   The rule also provides that the process costs and witness fees for such witnesses will be provided just as they are for the Government's witnesses.   *Id.*   The District Court concluded that the proposed testimony of Smith, Davis, and Bruno, while possibly relevant, was not necessary to Gravley's adequate defense.

Gravley, who filed his motions pro se, does not assert that he was able to pay witness fees for Smith, Davis, or Bruno; additionally, *Fleming v. Metrish*, 556 F.3d 520 (6th Cir. 2009), on which Gravley relies, makes no mention of Criminal Rule 17(b).   Gravley construes his claim broadly as asserting the denial of his constitutional right to present a defense, to which *Fleming* provides that the de novo standard of review applies.   556 F.3d at 533.   *Fleming*, however, was a habeas case in which a state court had refused to consider certain of the defendant's claims.   *Id.* Here, by contrast, Gravley merely asserts that the District Court would not allow him to compel the presence of certain witnesses, on the Government's dole, in *support* of his claims—witnesses whose testimony, in the District Court's judgment, was not necessary to Gravley's adequate defense.   Accordingly, we hold that the authorities on which the Government relies, which deal

expressly with Criminal Rule 17(b)—*see, e.g.*, *United States v. Sprouse*, 472 F.2d 1167, 1168 (6th Cir. 1973) ("The trial court's denial of this [Criminal Rule 17(b)] motion was not an abuse of its discretion, and will not be disturbed on appeal." (citation omitted)); *United States v. Rigdon*, 459 F.2d 379, 380 (6th Cir. 1972) ("In th[e] determination [of whether the presence of the witness is necessary to an adequate defense of his case], the District Court is vested with a wide discretion[.]" (citing *Welsh v. United States*, 404 F.2d 414 (5th Cir. 1968)))—provide the applicable standard of review: abuse of discretion.

Relying on *United States v. Barker*, 553 F.2d 1013, 1020 (6th Cir. 1977), Gravley counters that, even under Criminal Rule 17(b), a district court must compel the presence of witnesses whose proposed testimony is relevant unless a request for that testimony is "otherwise frivolous." But *Barker* stated that a witness's testimony must be both "material and useful," in addition to being relevant, to satisfy the showing of necessity that Criminal Rule 17(b) requires. 553 F.2d at 1020 (citing *United States v. Greene*, 497 F.2d 1068, 1079 (7th Cir. 1974)). The District Court's denial of Gravley's motion for reconsideration and renewed motion to subpoena Smith, Davis, and Bruno forecloses such a finding here.

As to Smith and Davis, the District Court expressly noted that it "d[id]n't think they w[ould], either one, substantially further the resolution of the case." And, as to Bruno, the court explained that Gravley had "articulate[d] a point that would be fair to make and would . . . survive a challenge on . . . relevancy . . .but [would not be] necessary to [Gravley's] adequate defense[.]" Gravley contends that Bruno would have undercut the Government's theory that Gravley had a gang-related motive by testifying to the lack of gang activity at Big Sandy. But it is difficult to see how such testimony about general relations between the various factions at Big Sandy, if relevant, would have been material or useful given the specific testimony of multiple

witnesses—among them Johnson, Player, Woods, and Thomas—that the assault on Peterson was gang-related. Woods and Thomas, for example, both testified that Peterson's derogatory comment about the Bloods gave rise to animus between him and Gravley. Johnson and Thomas, inmates in different facilities, both testified that Milburne would "get rank" within the Bloods for assaulting Peterson.

Similarly, testimony that neither Smith, Davis, nor Bruno heard Peterson scream Gravley's name could just as easily mean that Milburne was successful in keeping him from being heard—as Thomas testified he sought to do—as that Peterson never screamed Gravley's name in the first place. Such testimony also would be inconsistent with the testimony of Crawford—who, unlike Smith, Davis, and Bruno, was *in* Cell D-240—that Peterson both screamed and pleaded with Gravley to stop hitting him. Gravley also contends that Smith, Davis, and Bruno's testimony that they were not asked to house Peterson in their cells would have bolstered his theory that BOP personnel deliberately placed Peterson in Cell D-240. But as the District Court explained in denying Gravley's motion to dismiss the indictment against him, such evidence, "while certainly inculpatory of the BOP, is not automatically exculpatory as to Gravely." "The most the alleged evidence [would] show[ ], described most pejoratively, is that officials at the BOP are *also* guilty of conspiring to murder Peterson."

Finally, Gravley contends that "[c]ost is not a factor" that the District Court should have considered in determining the necessity of Smith's, Davis's, or Bruno's testimony. He refers, here, to the District Court's observation that "in the particular case of Mr. Matthew Davis, extraordinary cost would be associated [with granting Gravley's motion] because it would require Mr. Davis . . . to be flown here from an out-of-state location." But neither in his principal brief, his supplemental pro se brief, nor his reply brief does Gravley cite any authority

for the proposition that this reasoning was inappropriate, contending only that "the 'expense' consideration finds no basis in the Criminal Rule itself." As the Government points out, this court expressly stated in *Rigdon* that courts "may consider the expense to the government and more particularly the danger to the public inherent in transporting inmates over [such] distances." 459 F.2d at 379. Further, in this case, a consideration of cost was secondary to the District Court's determination that the testimony of neither Smith, Davis, nor Bruno was necessary to Gravley's adequate defense.

We therefore conclude that the District Court did not abuse its "wide discretion" in denying Gravley's motions. *Id.* at 380.

Judicial Estoppel: Gravley's **second claim** on appeal asserts that because the Government allowed Milburne to plead guilty to the second-degree murder of Peterson, it was judicially estopped from prosecuting Gravley for Peterson's murder. According to Gravley, "[n]o party disputes that Milburne killed Peterson by strangling him. The only contested issue [i]s whether the killing was ordered by Gravley, or whether Milburne acted alone." Thus, Gravley contends, "[t]he factual basis of Milburne's plea agreement was inconsistent with the theory of prosecution against Gravley." Both Gravley and the Government agree that we review this claim, which Gravley asserts as a denial of Due Process, de novo.[8] *See, e.g.*, *United States v. Lawrence*, 735 F.3d 385, 405 (6th Cir. 2013) (citing, *inter alia*, *United States v. Jones*, 641 F.3d 706, 713 (6th Cir. 2011)) (explaining that constitutional challenges are reviewed de novo).

---

[8]Whether the use of inconsistent theories of prosecution amounts to a denial of Due Process has not been settled. *See Bradshaw v. Stumpf*, 545 U.S. 175, 187 (2005), *rev'g Stumpf v. Mitchell*, 367 F.3d 594 (6th Cir. 2004). The Supreme Court has stated, however, that a denial of Due Process is possible on such a basis, *id.*, and this court continues to recognize that possibility, *see Coley v. Bagley*, 706 F.3d 741 (6th Cir. 2013). For purposes of analyzing this claim, we assume without deciding that the use of inconsistent theories of prosecution amounts to a denial of Due Process.

As the District Court concluded, however, that Milburne pleaded guilty to murdering Peterson does not mean that he was not assisted by Gravley or ordered by Gravley to do it. And as the Government points out, "[Milburne's] plea agreement does not state that [he] acted alone[.]" The plea agreement therefore does not reflect any inconsistency that "exist[s] at the core of the prosecutor's cases against defendants for the same crime," *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000), or that is "inherently factually contradictory," *ibid*. In his reply brief, Gravley also contends that allowing Milburne to plead guilty to second-degree murder while prosecuting Gravley for premeditated murder and conspiracy to commit murder is inconsistent. But, again, he offers no authority for this proposition, and, as the District Court observed in denying this claim, "when the [G]overnment submits a proposed plea agreement that 'drops' previously filed charges, it is not admitting that those 'dropped' charges were baseless."

We hold that, assuming he adequately has stated a Due Process claim,[9] Gravley has not been denied Due Process.

Destruction of SHU Video Footage: Gravley's **third** and **seventh claims** on appeal both concern the BOP's failure to preserve the bulk of nineteen hours of video footage from the SHU corridors on November 12 and 13, 2006. In the **third claim**, Gravley submits that the District Court committed reversible error when it declined to provide a jury instruction on concealment or destruction of evidence. This court reviews that claim for abuse of discretion. *United States v. Henderson*, 307 F. App'x 970, 978 (6th Cir. 2009) (quoting *King v. Ford Motor Co.*, 209 F.3d 886, 897 (6th Cir. 2000)). A district court abuses its discretion when it refuses to give a requested jury instruction (1) that is legally correct, (2) that is not otherwise substantially

---

[9]*See supra* note 8 and accompanying text.

covered by the instructions actually given to the jury, and (3) whose absence substantially impairs the defendant's defense. *Id.*

Here, Gravley contends that the jury instruction that he requested satisfies all three requirements. Yet again, however, he offers no supporting authority. As the District Court observed, the instruction was designed for use *against* defendants who have destroyed or concealed evidence, and not *by* defendants who are alleging the destruction or concealment of evidence. Accordingly, there is some question as to whether the requested instruction ever could be a correct statement of law under the circumstances of a case such as this one. Additionally, the District Court concluded that Gravley could establish neither that the lost footage was "materially exculpatory," *Wright*, 260 F.3d at 570-71 (citing *Trombetta*, 467 U.S. at 485), nor that it had been overwritten in bad faith, *id.* at 571 (citing *Youngblood*, 488 U.S. at 57-58). Thus, even assuming that the instruction was a correct statement of law and not covered by the other instructions with which the jury was charged, *see Henderson*, 307 F. App'x at 978, the District Court's refusal to give it likely did not impair Gravley's defense.

The District Court denied Gravley's motion to dismiss the indictment against him, the allegations of which his **seventh claim** on appeal renews, for similar reasons. This court reviews the denial of Gravley's motion to dismiss de novo, *United States v. Jobson*, 102 F.3d 214, 217 (6th Cir. 1996) (citing *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993)), and reviews the District Court's determination that Gravley did not demonstrate bad faith on the part of the BOP for clear error, *United States v. Branch*, 537 F.3d 582, 590 (6th Cir. 2008) (citing *United States v. Cody*, 498 F.3d 582, 589 (6th Cir. 2007)). We conclude that the District Court did not err in denying Gravley's motion to dismiss for the reasons stated in the District Court's opinion. Gravley can demonstrate neither that the missing footage was "materially exculpatory," under

*Trombetta*, 467 U.S. at 485, nor that it was overwritten in bad faith, under *Youngblood*, 488 U.S. at 57-58. And, given the timelines of the video footage produced by Agent Schumacker and Warden Hastings and other available evidence, even if Gravley had demonstrated bad faith he would not have been able to show "that he [could not] obtain comparable evidence by other reasonably available means." *Branch*, 537 F.3d at 590 (citing *Wright*, 260 F.3d at 571).

Consequently, the District Court properly exercised its discretion in refusing to give the jury instruction that Gravley requested and did not err in denying Gravley's motion to dismiss.

Closing Arguments: Gravley's **fourth claim** on appeal asserts an issue that he did not raise below—misconduct during the Government's closing argument. Accordingly, we may consider the claim forfeited. *See, e.g., United States v. Rodriguez*, 544 F. App'x 630, 633 (6th Cir. 2013) (citing *Poss v. Morris*, 260 F.3d 654, 663 (6th Cir. 2001)) ("Appellate review is, of necessity, limited to issues addressed by the court below.") In the interest of being comprehensive, however, we briefly address it. Gravley and the Government agree, again, on the standard of review that applies to such a claim: plain error. *See United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008) (citing *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001)). This standard requires Gravley to demonstrate an obvious error that prejudiced his substantial rights and "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Ibid.*

Here, Gravley complains that the Government improperly told the jury in closing arguments that Gravley's statement to Milburne, "We're going to eat his food," meant, "It is time to attack." He also contends that the Government improperly appealed to the passions of the jury when it told them that the inmates who testified would be labeled "snitch[es]" and that they would have "a walking death penalty" when they returned to their facilities. Finally, Gravley

asserts that the Government improperly inflamed the passions of the jury by emphasizing the brutality of Peterson's death when it directed them to photographs of Peterson that had been admitted in evidence because of their "clinical nature." None of these allegations reflects an obvious error, much less any prejudice to Gravley's substantial rights or adverse effect on the integrity of the judicial proceedings against him.

This court recognizes prosecutorial misconduct only when two circumstances have been established: (1) challenged remarks by the prosecutor were improper; and (2) the remarks were so flagrant as to require reversal. *Henry*, 545 F.3d at 376. In determining flagrancy, we consider whether a remark misled the jury or prejudiced the defendant; whether such remarks were extensive; whether such remarks deliberately were placed before the jury; and the overall impact of the remarks on the strength of the case against the defendant. *Id.*

As to the first challenged statement here, Crawford expressly testified that he understood "We're going to eat his food" to mean that Gravley and Milburne were "going to do something to [Peterson]," "[p]hysically." No read of that testimony communicates an understanding contrary to the Government's representation that an attack on Peterson was imminent. The second statement also is borne out by the record. As David Johnson expressly testified, murder is an understood consequence of testifying against another inmate and being labeled a "snitch" or "hot." As for Gravley's complaint about the Government's commentary regarding the photographs of Peterson, he mounts no meaningful challenge to the photographs or their "clinical nature," on the basis of which they were admitted into evidence.

Under our precedent, prosecutors enjoy "wide latitude . . . during closing argument," *Henry*, 545 F.3d at 377, and they may "argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence,"

*Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005). Against this standard, and in tandem with the limited review that plain error inquiry affords, we hold that the challenged statements do not amount to prosecutorial misconduct, and the District Court did not err in permitting them.

Woods's Perjury: Gravley's **fifth claim** on appeal asserts the basis on which he sought a new trial before the District Court—Woods's prior perjury before a grand jury in Tennessee. Gravley and the Government agree that this court reviews the denial of a motion for new trial under Criminal Rule 33 for abuse of discretion. *See United States v. White*, 492 F.3d 380, 408 (6th Cir. 2007) (citing, *inter alia*, *United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997)). For the reasons expressed in the District Court's denial of Gravley's motion, we conclude that the court did not abuse its discretion. Woods's perjury, while useful as impeachment evidence, was not likely material nor likely to have produced Gravley's acquittal for at least two reasons: (1) other witnesses corroborated Woods's testimony; and (2) the Government offered other evidence of Gravley's guilt.

Sequestration Order: Gravley's **sixth claim** on appeal renews his motion for a mistrial on the basis of a purported violation of the District Court's sequestration order, which the District Court denied. Gravley and the Government agree that our review of that denial is for abuse of discretion. *See United States v. Martin*, 516 F. App'x 433, 448 (6th Cir. 2013) (citing, *inter alia*, *United States v. Rugiero*, 20 F.3d 1387, 1392 (6th Cir. 1994)); *United States v. Atisha*, 804 F.2d 920, 926 (6th Cir. 1986) (citing *United States v. Faulkenbery*, 472 F.2d 879, 882 (9th Cir. 1973)). Federal Rule of Evidence 615 requires a court to "order witnesses excluded [from the courtroom] so that they may not hear other witnesses' testimony" on request by a party. As Player admitted on the witness stand, he traveled to court with Woods and Thomas for two to

three minutes, and the three witnesses "discuss[ed] why [they] were there." Accordingly, Gravley contends, the District Court abused its discretion in refusing to grant a mistrial.

As Gravley concedes, however, this court "is yet to take a position" "regarding whether Rule 615 extends beyond the courtroom." *Martin*, 516 F. App'x at 448. Accordingly, the District Court's conclusion that the rule "requires [only] that witnesses are not allowed to remain in the courtroom during the testimony of other witnesses" cannot have been an abuse of discretion. Even an express violation of a sequestration order "does not automatically bar a witness'[s] testimony." *Id.* (quoting *United States v. Gibson*, 675 F.2d 825, 835-36 (6th Cir. 1982)). And even an express violation would require a showing "that the Government consented to or had knowledge of the witnesses' coordination of testimony" and that the defendant was prejudiced thereby, neither of which Gravley has made. *Id.* Accordingly, on the record before the court in this case, we conclude that the District Court did not abuse its discretion in denying Gravley's motion for a mistrial.

## B.      Pro Se Claims.

In addition to his principal and reply briefs, Gravley has filed a pro se supplemental brief, as he did many times before the District Court, that asserts three additional claims. As a preliminary matter, this court "do[es] not ordinarily consider *pro se* claims brought by a defendant represented by counsel on appeal[.]" *United States v. Jenkins*, 229 F. App'x 362, 370 (6th Cir. 2005). The District Court acknowledged a similar rule, but, "out of an abundance of caution," considered Gravley's pro se factual assertions and omitted only his pro se legal arguments. Gravley's repeated pro se claims thus already have received more than due consideration. Again, however, in the interest of comprehensiveness, we briefly address them.

Failure to correct false testimony by Woods and Crawford: Gravley's **first pro se claim** on appeal asserts that he was denied his Due Process right to a fair trial because the Government failed to correct false testimony by Woods and Crawford. We review this claim, which Gravley asserts as a denial of Due Process, de novo. *See Lawrence*, 735 F.3d at 405 (citing, *inter alia*, *Jones*, 641 F.3d at 713 (explaining that constitutional challenges are reviewed de novo)). To establish a Due-Process violation, Gravley must establish (1) the actual falsity of the testimony, (2) the prosecution's knowledge of the falsity, and (3) the materiality of the testimony. *See United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (citing *United States v. O'Dell*, 805 F.2d 637, 641 (6th Cir. 1986)).

Gravley relies on two excerpts from Woods's testimony, having to do with (1) Woods's testimony before the grand jury in Tennessee and (2) Woods's representation that he was serving a life sentence for "[j]uror conspiracy" instead of "conspiracy to distribute cocaine." On both scores, Gravley's claim fails because even if he can establish the testimony's falsity and the Government's knowledge of the falsity, the testimony was not material.

During Gravley's trial, the Government asked Woods whether he ever had "testified against anyone in the past." Gravley asserts that Woods's response, "No, sir," was false because of Woods's prior grand jury testimony in Tennessee. As the Government points out, however, "[a] grand jury proceeding is not an adversary hearing," *United States v. Calandra*, 414 U.S. 338, 343 (1974). Accordingly, there is some question as to whether Woods's representation that he never had testified *against* anyone was false, and, if so, whether the Government knowingly presented it as such. Assuming *arguendo* that the testimony was false, however, and crediting Gravley's accusation that the Government was aware of the falsity, Gravley's claim still fails. As the District Court explained when it denied Gravely's motion for a new trial, any

impeachment of Woods would have been of limited value because other witnesses corroborated Woods's testimony and because the Government offered other evidence of Gravley's guilt. Accordingly, Woods's testimony, true or false, was not material.

As to the second excerpt, Gravley himself was not misled by Woods's representation that Woods was serving a life sentence for "[j]uror conspiracy" rather than "conspiracy to distribute cocaine," as was correct. Gravley later explained to the jury that Woods "got a life sentence for drug transportation, drug—drug something, some involvement with drugs. A life sentence. That was not a little bit." Accordingly, even if we again assume *arguendo* the satisfaction of first two elements that Gravley must establish, he cannot demonstrate materiality.

Regarding Crawford's testimony, Gravley contends that Crawford's representation that he "initially t[old] [prison officials] what happened [to Peterson]," was false because he did not make a statement to the officers who first interviewed him. Gravley attaches to his supplemental brief, as support for this claim, documentation of Crawford's interview with an SIS Lieutenant, "B. Feldt," at approximately 1:50 PM on November 13, 2006. According to this documentation, "Inmate Crawford refused to make any statement and did not wish to communicate in any form to either [B. Feldt] or [FBI] Agent [Steve] Spahn."

Assuming the truth of this documentation, the falsity of Crawford's statements, and the Government's knowledge of the latter's falsity, Gravley still cannot demonstrate materiality for an important reason: Crawford's testimony already had been impeached by the testimony of other witnesses. Both Johnson and Woods, for example, represented that Crawford had participated in the assault on Peterson. (*Compare, e.g.,* PageID # 2068 (Johnson), *and* PageID # 2164 (Woods), *with* PageID # 1919 (Lawyer: "Did you participate in the assault?" Crawford: "No.").) "'[W]here the undisclosed evidence merely furnishes an additional basis on which to

challenge a witness whose credibility has already been shown to be questionable . . . the undisclosed evidence may be cumulative, and hence not material.'" *Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir. 2000) (quoting *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998)).

Accordingly, Gravley's first pro se claim fails.

Sufficiency of the Evidence: Gravley's **second pro se claim** on appeal renews the allegations of his motion for acquittal under Criminal Rule 29. "In considering insufficiency of the evidence claims following a guilty verdict," this court determines whether, "'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Rosin*, 664 F.3d 1052, 1058 (6th Cir. 2012) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Consequently, the Government receives "'the benefit of all inferences which can reasonably be drawn from the evidence[.]'" *Id.* (quoting *United States v. Adamo*, 742 F.2d 927, 932 (6th Cir. 1984)).

In denying Gravley's motion, the District Court concluded that Gravley's challenges went to the weight, rather than to the sufficiency, of the evidence, which it was not allowed to consider under Criminal Rule 29. Additionally, the District Court concluded, "[t]he jury heard both Milburne and Crawford's testimony, and it was free to accept either the [G]overnment's theory regarding the duress alarm (i.e. that it exists but was not pushed) or Gravley's theory regarding the alarm." The jury chose the Government's theory with respect to the duress alarm and the remainder of Gravley's defenses, and there is record evidence to support that choice. Accordingly, we hold that the evidence was sufficient to support the charges against Gravley.

Prosecutorial Vindictiveness: Gravley's **final pro se claim** on appeal asserts that the Government obtained the superseding indictment against Gravley vindictively. Gravely,

originally accompanied by counsel, met with the Government in January of 2011 to discuss a possible plea agreement. At that meeting, a prosecutor allegedly told Gravley that the Government would seek a superseding indictment with additional counts against him if he did not plead guilty. Gravley rejected the proposed agreement and moved to dismiss the subsequently obtained superseding indictment for prosecutorial vindictiveness.[10] The District Court rejected the motion in a minute entry. This court reviews that denial for abuse of discretion, *United States v. Ladeau*, 734 F.3d 561, 565 (6th Cir. 2013), which exists when a district court "'relies on erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment,'" *id.* at 565-66 (quoting *Schlaud v. Snyder*, 717 F.3d 451, 457 (6th Cir. 2013)).

Prosecutors have "'broad discretion'" in deciding whom to prosecute and which charges to bring. *Id.* at 566 (quoting *Bragan v. Poindexter*, 249 F.3d 476, 481 (6th Cir. 2001)). As this court explained in *Ladeau*,

> Because plea bargaining offers a mutuality of advantage to defendants and prosecutors, and because the prosecution's ability to threaten a reluctant defendant with heightened charges is a necessary feature of a robust plea bargaining process, increased charges resulting from a breakdown of the plea bargaining process are not deemed vindictive, regardless of the fact that the prosecutor's goal is to persuade the defendant to forgo his constitutional right to stand trial.

*Id.* at 569 (internal citations and quotation marks omitted). Accordingly, so long as the Government engages a defendant in "the give-and-take" compromise though which he can

---

[10]This was a separate motion from Gravley's earlier motion to dismiss the superseding indictment, filed by counsel, due to the Government's failure to disclose the overwritten video footage from November 12 and 13, 2006, from the cameras in the SHU corridor. (*See* PageID # 174.)

negotiate a benefit, it does not violate the defendant's constitutional rights. *Id.* (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 362 (1978)).

Here, fully crediting Gravley's allegations, the Government engaged Gravley in the type of "give-and-take" that *Ladeau* and *Bordenkircher* envision. He did not like his options, the two parted ways, and the Government made good on its promise to seek additional charges. Such an exchange is a "necessary feature of a robust plea bargaining process." Accordingly, we hold that the District Court did not abuse its discretion in denying Gravley's motion to dismiss.

## III. CONCLUSION

For these reasons, we **AFFIRM** the District Court's judgment.